**PEPSI–COLA METROPOLITAN BOT-
TLING COMPANY, Inc., Defend-
ant, Appellant,**

v.

**PLEASURE ISLAND, INC., Plaintiff,
Appellee.**

**No. 6368.**

United States Court of Appeals
First Circuit.

May 10, 1965.

Sydney Berkman, Boston, Mass., with whom Richard Braverman and Howard M. Miller, Boston, Mass., were on brief, for appellant.

Jerome P. Facher, Boston, Mass., with whom S. Donald Gonson and Hale & Dorr, Boston, Mass., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Senior Circuit Judge (by designation).

This is an appeal from a judgment of the United States District Court for the District of Massachusetts entered on April 29, 1964, in an action to recover under a written lease for rent and other damages. The district court, sitting without a jury, found for the plaintiff in the total amount of $105,525.77, and on a counter-claim for the defendant in the total amount of $11,471.52, resulting in a judgment for the plaintiff in the net amount of $94,054.25.

Appellant, Pepsi-Cola Metropolitan Bottling Company, Inc., is a New Jersey corporation having a principal office in New York and bottling plants in various states, including one in Allston, Massachusetts. The appellee, Pleasure Island, Inc., is a Massachusetts corporation operating an amusement park, known as Pleasure Island, in Wakefield, Massachusetts. The concept of Pleasure Island originated in 1957 or 1958 as an idea of William Hawkes, then editor of Child Life Magazine. Hawkes was president of Pleasure Island for a time but is no longer associated with it. Hawkes was put in contact with one C. V. Wood of California who previously had been Director of Stanford Research Institute and who also had been general manager of Disneyland. In 1958 and 1959 Wood was president of a small engineering concern known as Marco Engineering Company. When Hawkes returned east he devoted his efforts to the planning, designing, financing, and building of the amusement park that was to be known as Pleasure Island. Eventually the park began to take shape, and Pleasure Island then undertook to obtain lessees who would take space, construct exhibits, and advertise or sell their products. On or about March 26, 1959, a written contract between Pleasure Island and Marco Engineering was entered into, making Marco the exclusive leasing agent for the park. As opening day drew near, Hawkes himself also attempted to get leases. In the winter of 1958 several substantial New England firms had agreed to take leases at the park and to provide or construct exhibits. The theme of Pleasure Island was in part New England and in part the Wild West, and the exhibits and construction were consistent with this theme. The premises which are the subject of this litigation are known as the "Diamond Lil Saloon" or the "Western Saloon," and are located in the so-called Western Area. The Western Saloon was approximately 2,700 square feet in area, and was decorated as an old-fashioned western saloon of the gas-light era with a mahogany bar for soft drinks and a stage for shows or performances. The interior fixtures and decorations were constructed at a cost of approximately $50,000, of which Pepsi-Cola paid one-half and Pleasure Island one-half.

In December, 1958, Pepsi-Cola had been solicited in regard to renting the Western Saloon. They had rented somewhat similar premises at Disneyland, known as the Golden Horseshoe, and had put on a show there. By 1959 Pepsi-Cola had been at Disneyland for four or five years, and Pepsi-Cola officials were acquainted with C. V. Wood from his associations with Disneyland. The Coca-Cola company had been approached at

about the same time. Hawkes and Wood had talked with two Coca-Cola executives, Frank Adams, head of local Coca-Cola bottling operations, and Frank O'Brien, regional sales manager for New England. Both Adams and O'Brien were aware that Pleasure Island wanted $25,000 for a five-year lease of the Western Saloon and that the first and last years' rent was to be paid in advance. The Pleasure Island Board of Directors had placed a valuation of approximately $10 per square foot as the rental value of Pleasure Island generally and believed that $25,000 was a fair rental value for the Western Saloon.

At some time in December, 1958, Wood spoke with one Richard Petrie, who was then executive vice-president of Pepsi-Cola. At a meeting and in a telephone conversation Wood told Petrie of the plans for Pleasure Island including the hoped-for success, financial and artistic, in the coming season. At this point the park was not in existence but only barely past the drawing board stage. In these conversations Wood sought to interest Pepsi-Cola in a five-year lease at $15,000 annually for the Western Saloon and to obtain a commitment from Pepsi-Cola to contribute $25,000 to the cost of constructing and furnishing the Western Saloon. Their negotiations for a lease at $15,000 per year did not ripen into a binding contract. Following his conversations with Wood, Petrie talked with Pepsi-Cola executives and thereafter told Wood that Pepsi-Cola would be agreeable to a five-year lease at $15,000 and to spending $25,000 to reimburse Pleasure Island for part of the Western Saloon. Wood reported this fact to the Board of Directors of Pleasure Island, but the Board did not approve a lease to Pepsi-Cola at $15,000 and reminded Wood of the $25,000 price put on the premises. Hawkes also expressed concern because at about the same time the premises had also been offered to Coca-Cola for $25,000 per year. Coca-Cola's local representatives were interested and enthusiastic about the prospects of Pleasure Island and in fact had first contacted Hawkes

shortly after October, 1958, and before Pepsi-Cola had begun its negotiations. Also, one Garrard, Coca-Cola's vice-president in charge of national sales, had gone to Boston to assist the local representatives in negotiating for the availability of their products at Pleasure Island.

After Wood's meeting with the Pleasure Island Board of Directors, he telephoned Petrie, who was then in his office in New York. There was a conflict of testimony as to the exact nature of this telephone conversation between Wood and Petrie. Petrie testified as to his memory of it, and Linnell, a director of Pleasure Island, and Hawkes testified as to what Wood told them about this conversation. Wood did not testify. The trial court found that C. V. Wood asked Petrie whether Pepsi-Cola would agree to execute a five-year lease in which the yearly rental figure was raised from the $15,000 discussed in their earlier talks to $25,000; that he told Petrie that it embarrassed him to make this request but that it was necessary to do so because the Pleasure Island Board of Directors would not approve a lease at $15,000 per annum and because other representatives of Pleasure Island were then actively negotiating with Coca-Cola for a $25,000 per year lease. The trial court disbelieved Petrie's claim that Wood told him Coca-Cola had made an offer of $25,-000, legally binding upon acceptance by the Pleasure Island Board of Directors; rather, it found that if the word "offer" was used at all, it was used in such a context as to indicate to an experienced businessman only that employees of Coca-Cola were then engaged actively in negotiating with Pleasure Island for a possible contract and lease.

An increase from $15,000 to $25,000 was agreed to and the lease was executed on or about April 6, 1959, by Philip Rubenstein, then president of Pepsi-Cola. Thereafter, the sum of $50,000 was paid by Pepsi-Cola to Pleasure Island for the first and last years' rent as the terms of the lease provided. Pepsi-Cola was sold exclusively in the park in 1959, and an expensive and good quality show was

put on by Pleasure Island in the Western Saloon. The show was a popular attraction, and approximately 275,000 Pepsi-Cola drinks were sold in the Western Saloon. However, at the end of the 1959 season Pepsi-Cola was aware of what the season's total attendance at the park was and the various problems with weather, construction, and other matters which affected attendance, as well as the park's financial difficulties following the 1959 operations. Between September 30, 1959, and May 15, 1960, as Pepsi-Cola was aware, the park was trying to organize its financial affairs, deal with creditors, obtain new financing, and prepare for the 1960 season. Finally, in May, 1960, new capital to the extent of $134,000 was brought into the corporation, contributed by Messrs. Smith, Lee and Linnell. Problems with creditors were largely resolved, and Pleasure Island prepared to and did reopen for the 1960 season.

The lease contained a provision that Pepsi-Cola should have an option by written notice to Pleasure Island on or before March 1 of each year to require the latter to operate the Western Saloon and to supply the entertainment. Pepsi-Cola never exercised this option in 1960 despite a reminder by Pepsi-Cola's general manager in Boston, McCaffrey, and Pepsi-Cola thereby became obligated to put on a show at its own expense. The cost of the show put on by Pleasure Island in 1959 was approximately $50,000. On May 4, 1960, McCaffrey forwarded newspaper clippings to Pepsi-Cola executive offices in New York indicating the park would reopen. On May 16, 1960, Pepsi-Cola wrote a letter to Pleasure Island purporting to terminate the lease.

On May 24, 1960, Pleasure Island notified Pepsi-Cola that it had wrongfully repudiated the lease. Ultimately Pleasure Island brought suit in 1962. Pepsi-Cola failed to pay any rent to Pleasure Island in 1960, 1961, and 1962. The Western Saloon premises were available to Pepsi-Cola, but they did not attempt to utilize them or exercise any rights with respect to them. Although the premises thus remained available, Pleasure Island continued in 1960 to put on a show consisting of old-fashioned movies and cartoons and to operate the Western Saloon itself. It also attempted, without success, to relet the premises to someone else.

The trial court found that Pepsi-Cola owed Pleasure Island a total of $75,000 for the years 1960, 1961, and 1962, with interest, for unpaid rent. It also found that there was no evidence of any credit to which Pepsi-Cola was entitled for whatever net income Pleasure Island may have derived from the use of the premises during those years. The trial court further found that Pepsi-Cola owed Pleasure Island $5,441.00, with interest, for five insurance premiums; $1,235.00 with interest for real estate taxes paid by Pleasure Island; and $10,000 as a reasonable attorney's fee. The trial court found for Pepsi-Cola on two counterclaims, in the total amount of $9,083.45, with interest.

Pepsi-Cola's first major contention on this appeal is that the trial court erred in finding that Pepsi-Cola was not induced by Pleasure Island to enter into the lease by a false representation of an offer by Coca-Cola. The trial court declined to believe Petrie's testimony, that Wood represented to him that Coca-Cola had made a firm offer of $25,000, which would become legally binding on Coca-Cola if the Pleasure Island Board of Directors elected to accept it. Instead, the court found that if the word "offer" entered into the conversation at all, it was used in such a context as to express no more than that Coca-Cola employees were actively engaged in negotiation with Pleasure Island for a possible contract. Further, the court found that, even assuming that such statements as to Coca-Cola were untrue, they were not relied on by Pepsi-Cola and were not in any degree an important or material inducement or persuasion to enter into the lease. Pepsi-

Cola takes issue with the entirety of these findings, urging that they are clearly erroneous and that the truth of the matter is that Pepsi-Cola was induced to enter into the lease by Pleasure Island's false representation, through its agent Wood, that Coca-Cola had made an offer of $25,000.

The only direct evidence of a representation that Coca-Cola had made an offer was Petrie's testimony to that effect. This the trial court declined to believe. Such a finding of a trial court, dependent upon oral testimony where the candor and credibility of the witness would best be judged, has great weight with this court. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Having no definite and firm conviction that a mistake has been committed in this respect, we believe that the court's finding should stand.

Beyond that, however, we are not in accord with the district court as to the inferences it drew in concluding what Wood did tell Petrie and what effect the conversation did have on Pepsi-Cola's agreeing to a lease at $25,000 rather than $15,000. It would seem to us that in all probability what happened was that Wood reported to Petrie on the state of negotiations with Coca-Cola and on the Pleasure Island Board's displeasure with a tentative offer to Pepsi-Cola below the authorized figure of $25,000. A careful review of the testimony at the trial indicates that it no doubt appeared at the time that Coca-Cola was very near to agreeing to a lease at $25,000. Indeed, it must have seemed to Wood—and it probably seemed to Petrie—that Pepsi-Cola would have to agree to $25,000 to remain in the running. It may fairly be inferred that it was in reliance on this belief that Petrie agreed to $25,000.

The record tends to support this conclusion. Hawkes' and Linnell's testimony indicates that considerable interest was shown by local Coca-Cola representatives in being a part of Pleasure Island. Hawkes said there was "a great deal of enthusiasm. He [Mr. Adams] wanted, as I recall, five or six days in which to come back with an answer." Again, "Mr. Adams and Mr. O'Brien were quite keen on the idea of Pleasure Island and in my best judgment wanted the deal. However, it was also my understanding that a move could not be made until at least they had some sort of approval by the president of the company, but they expected to have that within four or five days." And, "Mr. Adams particularly was very excited about the project and definitely wanted to bring his company into it." To the best of Hawkes' memory, the expression of interest originated with Coca-Cola, and the local representatives were "upset" when eventually they did not have the opportunity to come in. Linnell testified that Hawkes had told him that Coca-Cola was very much interested at $25,000; in fact, he said it was his impression that they had an "agreement" with Coca-Cola, i. e., that they had "an understanding with local officials, they would proceed to close an official deal with us." In addition to this interest by local representatives, interest was also shown by the parent company in Atlanta. One Garrard, vice-president in charge of national sales, traveled to Boston to meet with Hawkes and Wood. Hawkes understood the purpose of the visit was to get the needed approval. Garrard himself said, in a deposition, that he was "sure" he "listened very attentively" and that he probably said he would "go back to Atlanta and take it up with our people, * * * and that I would be back in touch with them."

It was against this background that Wood contacted Petrie and caused him to meet the $25,000 figure being negotiated with Coca-Cola. It is unlikely he told Petrie Coca-Cola had actually made an offer of $25,000. He knew there was no actual offer, since he had been present when Garrard said he would have to take

up the $25,000 figure with officials in Atlanta. Beyond that, the record discloses no particular reason why Wood should misrepresent the state of negotiations with Coca-Cola. It is just as likely he was attempting to protect Pepsi-Cola's interests. Petrie testified that Wood was friendly with certain people in Pepsi-Cola, and that he had "pleasant relations with Pepsi-Cola at Disneyland." According to Linnell, "Mr. Wood argued for the fact that he should have a right to go back to Pepsi-Cola and ask them to agree to the deal of $25,000." There is no compelling reason to believe that Wood then contacted Petrie and told him Coca-Cola had made an offer, when he knew that was not true. It seems much more likely, viewing the matter most favorably to Pepsi-Cola, that Wood told Petrie there was an agreement with local Coca-Cola representatives and that approval was being sought from officials in Atlanta, which approval might be forthcoming. In any event, we do not think the record sustains proof of any more than that.

■■ The question remains whether this statement, assuming it to be the substance of what Wood told Petrie, amounted to such a misrepresentation as would justify rescission of the lease by Pepsi-Cola. It is the rule in Massachusetts that "one who has been induced to enter into a contract in reliance upon a false though innocent misrepresentation of a material fact susceptible of knowledge which was made as of the party's own knowledge and was stated as a fact and not as a matter of opinion is entitled to rescission." Yorke v. Taylor, 332 Mass. 368, 124 N.E.2d 912, 914, 915 (1955). It is also the rule in Massachusetts that "false statements of opinion, of conditions to exist in the future, or of matters promissory in nature are not actionable." Yerid v. Mason, 341 Mass. 527, 170 N.E.2d 718 (1960). We think the latter rule is applicable here.

■■ At the very most, the record indicates that Wood may have said that there was an agreement with local Coca-Cola representatives and that he thought Garrard would secure approval of that agreement in Atlanta. The testimony discloses that there was indeed considerable agreement with the local representatives; as to that matter, then, there could have been no real misrepresentation. And, as to whether Atlanta's approval would be forthcoming, Wood could do no more than give his opinion. That was a matter not susceptible of Wood's knowledge, as Petrie must have known. "When a representation relates to a matter not susceptible of personal knowledge, it cannot be considered as anything more than a strong expression of opinion, notwithstanding it is made positively and as of the maker's own knowledge. * * *" Harris v. Delco Products, 305 Mass. 362, 25 N.E.2d 740, 742 (1940). Wood could not have known whether Coca-Cola executives would ultimately approve a lease at Pleasure Island. He could only conjecture, and Petrie could only accept what he said as conjecture. The fact that Pepsi-Cola may have relied on Wood's conjecture and accepted a $25,000 figure to keep Coca-Cola out of Pleasure Island may be unfortunate for Pepsi-Cola, but it cannot relieve them from their lease.

■ Pepsi-Cola's second major contention is that the lower court erred in finding that Pleasure Island's continued operation of the Western Saloon as a theatre did not constitute an acceptance of surrender by operation of law. "[A]ny acts which are equivalent to an agreement on the part of a tenant to abandon and on the part of the landlord to resume possession of demised premises amount to a surrender of a term by operation of law. * * * There must be a meeting of the minds and the intent of the landlord to accept the surrender must be clearly shown." Cassidy v. Welsh, 319 Mass. 615, 67 N.E.2d 226 (1946). That intent is not proved, however, when it is shown that the tenant

never was excluded from the premises and that the use of the premises was consistent with the landlord's right to protect his property. Bandera v. Donohue, 326 Mass. 563, 95 N.E.2d 654 (1950); Roberts v. Wish, 265 Mass. 179, 163 N.E. 892 (1928). There was testimony in the court below that the Western Saloon remained available to Pepsi-Cola and that in fact the velvet "Pepsi-Cola" curtain remained hanging. It also appears that Pleasure Island kept the Western Saloon open to protect its overall investment in the park: Pleasure Island's president in 1963 testified that it "seemed wrong" to leave a key exhibit locked up or vacant.

The question is thus raised, whether the circumstances presented by this case —continued, complete occupancy of the theatre—require us to apply the doctrine of acceptance of surrender. The Massachusetts case closest on its facts to the instant one is Bandera v. Donohue, supra. That case involved leased premises consisting of a basement in which classes of fifty to sixty members were held two or three times a day, although not between the hours of 11:00 p. m. and 9:00 a. m. Many persons resorted to various other parts of the building and also frequented the corridors at different times during the day and night in entering and leaving the building. After the tenant vacated the premises, the landlord commenced to permit the janitor, whom he employed to care for the building, to use as sleeping quarters a portion of the demised premises. The trial judge found that there was no acceptance of a surrender by the owner; the Supreme Judicial Court affirmed, declining to hold as a matter of law that there was.

While it can readily be seen that the use of the vacated premises was far more extensive in the case now before us, the Bandera case nevertheless is important for its lesson: that a landlord is not required to allow vacated premises to remain empty and unprotected. The case

is important as well in the significant language it employs:

> "For aught that appears, the duration of his [the janitor's] use was revocable at the will of the landlord and presumably was for so long as the premises remained vacant and needed protection from persons who resorted to the building at night. This use by the janitor did not interfere with the rights of the defendants to the demised premises or preclude them from enjoying them in accordance with their lease if they saw fit to occupy them. They were still held available to them by the landlord. The conduct of the landlord in dealing with the premises could be found to be not inconsistent with an intent not to terminate the relationship of landlord and tenant existing between him and the defendants [the tenants]. * * *" 95 N.E.2d at 656.

We are of the opinion that the differences in the facts between that case and the case before us are caused not by a different intention of the landlord, but rather by the different exigencies created by the tenant's vacating of the premises; and that Bandera is therefore, controlling here. As in Bandera, Pleasure Island gave Pepsi-Cola written notice of its intent to hold them to the lease. It is apparent from the record that Pleasure Island's motive in operating the theatre itself may have been to protect the investment in the park and that there may have been no intent by officials of the park in the meantime to exclude Pepsi-Cola or prevent their return. In any event, the trial judge was entitled to believe testimony to that effect. We do not agree with Pepsi-Cola that the Bandera case may be distinguished on the basis of the fact that the janitor used the room only during the night hours, when the tenant was not customarily in actual possession of the premises. There is nothing in the opinion in that case to indicate that the tenant was not as much entitled to use the

premises at night as during the day. Rather, we take the fact of the janitor's nighttime occupation as being only evidentiary of a lack of intention to exclude. If the use of the premises in the case before us seems more "total and complete," it should be noted that protection of the premises by Pleasure Island perhaps demanded totalness and completeness in a physical sense. In any event, we do not think the difference is controlling. The district court found that the premises remained available to Pepsi-Cola and that there was good reason for Pleasure Island's use of them. We are not inclined to find otherwise as a matter of law.

Having based our decision on principles of landlord and tenant, we do not reach Pepsi-Cola's contention that Pleasure Island failed to give notice of default in rent, as required by the lease. Pleasure Island did not choose to pursue the remedy available to it under the lease.

During the trial the court excluded portions of a deposition taken of Philip Rubenstein, vice-president of Pepsi-Cola, and formerly its president. It was excluded under Fed.R.Civ.P. 26 (d) (3) on the ground that his absence more than 100 miles from trial had been procured by Pepsi-Cola, and Pepsi urges this as reversible error. The portions of the deposition offered contained testimony to the effect that the decision to terminate the lease was made by O'Donnell and that his motivation was that he had learned that Coca-Cola had not made any offer. There was testimony by Petrie to the same effect elsewhere in the record. While there is no iron-clad rule with respect to cumulative testimony we conclude there was no prejudicial error in this instance. We, therefore, do not decide whether the trial court erred in excluding it.

We have considered the other points raised by Pepsi-Cola and have concluded that they are without merit.

Judgment will be entered affirming the judgment of the district court.