**ATLANTIC OVERSEAS CORPORATION,**
**Plaintiff,**

v.

**Louis H. FEDER, Pioneer Institutional Trading Company, Paulssen & Guice, Ltd., and L. H. Feder Corporation, Defendants.**

**No. 75 Civ. 4248.**

United States District Court,
S. D. New York.

May 12, 1978.

**348**

Haight, Gardner, Poor & Havens, New York City, for plaintiff; M. E. DeOrchis, Chester D. Hooper, Vincent M. DeOrchis, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendants; Michael Marks Cohen, Derrick W. Betts, Jr., New York City, of counsel.

## OPINION

BONSAL, District Judge.

This is an action brought by plaintiff Atlantic Overseas Corporation ("AOC") on

behalf of the operators of the vessel the M/V DUMURRA to recover from defendants the sum of $65,520 paid to the Ivory Coast Customs Authorities ("Customs") in settlement of a fine imposed upon the DUMURRA for underdeclaration of weight with respect to a cargo of used clothing. Named as defendants in this action are L. H. Feder Corporation which does business under the name of Pioneer Institutional Trading Company (both hereinafter referred to as "PITC"), Louis H. Feder, its president, and Paulssen & Guice, Ltd. ("P & G"), the freight forwarder for PITC. In this action which was tried to the Court without a jury the only witness called by either side was a witness called by AOC to testify as an expert on the customs laws of the Ivory Coast. The balance of the evidence in this case consists of depositions, documentary exhibits and stipulations of facts stated in the pretrial order.

### Factual Background

In early 1974 PITC contracted to sell a purchaser in Niamey, Niger: (1) 500 bales of used original shorts consisting of 140 pounds per bale; (2) 500 bales of used cotton pants consisting of 100 pieces per bale; (3) 100 bales of used boys' shirts consisting of 300 pieces per bale; and (4) 300 bales of used men's shirts consisting of 200 pieces per bale. The contract price for all 1400 bales of used clothing was $44,200 CIF Abidjan, Ivory Coast.

The above cargo was booked aboard the DUMURRA for shipment from New York to Abidjan, Ivory Coast. From Abidjan the cargo was to be transported inland by road and rail to Niamey, Niger.

P & G prepared the bill of lading and the certificate of origin for the cargo on the basis of PITC's commercial invoice which indicated a weight of 140 pounds per bale for the 500 bales of used shorts but provided no weight for the remaining 900 bales sold by the piece. P & G erroneously assumed that all 1400 bales of used clothing weighed 140 pounds per bale and, based on this assumption, stated the total weight of the cargo to be 196,000 pounds on the bill of lading and the certificate of origin.

The draft dock receipts which were prepared by PITC and which accompanied the cargo to the pier indicated that the weight of the cargo was 105,000 pounds. PITC's clerk had arrived at this figure of 105,000 pounds by estimating the weight of each of the 1400 bales to be 75 pounds, overlooking the fact that the 500 bales of shorts actually weighed 140 pounds each.

When the cargo arrived at the pier AOC noticed the discrepancy between the weight indicated on the dock receipts prepared by PITC and the weight indicated on the bill of lading prepared by P & G and contacted P & G to ascertain which weight was correct. After consulting with PITC, P & G advised AOC that, based on information P & G had received from PITC, the correct weight of the cargo was the weight of 105,000 pounds indicated on the dock receipts. On the basis of this communication, AOC changed the weight on the bill of lading from 196,000 pounds to 105,000 pounds and used the latter figure in preparing the DUMURRA's cargo manifest. Unfortunately, however, neither PITC nor P & G changed the certificate of origin to conform to the weight stated in the corrected bill of lading.

On June 22, 1974 the DUMURRA arrived in port at Abidjan, Ivory Coast and discharged the cargo of used clothing. Customs subsequently noticed the discrepancy between the weight of the cargo indicated on the cargo manifest and the bill of lading on the one hand and the weight indicated on the certificate of origin on the other hand and notified AOC's local agent in the Ivory Coast, Societe Navale Transafric ("Transafric") that because the weight of the cargo was underdeclared the vessel would be subjected to a fine for Customs fraud. Although Customs initially informed Transafric that this fine would be 45 million African Financial Community ("CFA") francs, equivalent to $189,000 (U. S.), it later informed Transafric that the potential fine might be as much as 156 million CFA francs, equivalent to $655,200. As a result of negotiations between Trans-

afric and Customs, Customs thereafter agreed to accept $65,520, or 10% of the potential fine, in settlement of this matter. Transafric communicated this proposal to AOC which authorized Transafric to enter into the settlement and to pay the amount of $65,520 on behalf of the vessel.

After its attempts to recover this amount from defendants proved unsuccessful, AOC instituted this action for indemnity on behalf of the vessel owner.

### Discussion

### I. *AOC's Claim for Indemnity*

#### A.

AOC alleges that it was subjected to payment of $65,520 in settlement of the Customs fine solely on account of defendants' failure to state the correct weight of the cargo in the bill of lading and the certificate of origin and, accordingly, seeks recovery of this amount from defendants by way of indemnity. AOC asserts its claim for indemnity against defendants Feder (individually), PITC, and P & G on the basis of two separate theories, both of which are founded on defendants' alleged breach of warranty with respect to the actual weight of the cargo.

■ AOC first contends that it is entitled to indemnity from defendants under the provisions of section 3(5) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1303(5). Section 3(5) of COGSA provides in pertinent part that

"[t]he shipper shall be deemed to have guaranteed to the carrier the accuracy at the time of shipment of the marks, number, quantity, and weight, as furnished by him; and the shipper shall indemnify the carrier against all loss, damages, and expenses arising or resulting from inaccuracies in such particulars. . . ."

It does not appear that the above provision of COGSA has previously been relied upon by the courts as a basis for allowing a carrier to recover from a shipper amounts paid as fines to foreign customs authorities by reason of the fact that the weight of the cargo has been underdeclared by the ship-

per. Nevertheless, inasmuch as such a fine constitutes "damages and expenses arising or resulting from inaccuracies" in the particulars as to weight which the shipper is deemed to have guaranteed the carrier, the indemnity afforded by this provision of COGSA would appear to be properly applicable in such instances. *See generally, Spanish American Skin Co. v. M. S. Fern-gulf*, 143 F.Supp. 345, 350 (S.D.N.Y.1956), *aff'd*, 242 F.2d 551 (2d Cir. 1957).

■ AOC's second and alternative contention is that it is entitled to indemnity from defendants, even apart from COGSA, on the basis of the contract of carriage between the carrier and the shipper as set forth under the bill of lading. Under the terms of the bill of lading the shipper expressly assumed responsibility, inter alia, "for the due execution of all . . . certificates or documents required to accompany the goods" and "for payment of any duty, tax or impost of whatever nature, levied upon the ship by the authorities at any port of discharge . . . in connection with the goods [described in the bill of lading]." The bill of lading further provided that "any payment, fines, expenses, loss or damage, whether by detention or otherwise sustained or incurred by Carrier . . . in consequence of failure to comply with any of said conditions or stipulations shall be borne and paid by the Shipper . . ." One of the conditions of the contract of carriage was that the merchandise shipped under the bill of lading be "stated by Shipper to . . . measure and weigh as in the particulars [supplied by the Shipper]."

■ Since both COGSA and the contract of carriage set forth in the bill of lading speak only in terms of the responsibilities and liabilities of the "shipper" it appears that if AOC is entitled to indemnity on the facts of this case, it is limited by the express language of these provisions to recovery from defendant PITC, which alone qualifies as the shipper of the cargo in the instant case. Thus recovery may not be had against defendant Feder individually; Feder himself cannot be said to be the shipper of the cargo since his activities in

connection with the shipment of the cargo were strictly in his official capacity as president of PITC.

Nor does it appear that under these provisions recovery may properly be had against defendant P & G. As the freight forwarder for PITC, P & G was merely acting as an agent for the shipper PITC. Since P & G was not the "shipper" of the cargo, there is no basis under the above provisions for allowing AOC to recover indemnity against it.

■ Although AOC also seeks to recover indemnity from P & G on the alternative theory of negligence, it is readily apparent that this theory is likewise unavailing here. Under principles of negligence law, AOC would have to establish that P & G owed a duty to AOC to provide shipping documents which accurately stated the particulars as to the weight of the cargo. While P & G may have owed such a duty to PITC based on the agency relationship between them, it is clear that P & G owed no such duty to AOC. *See* 3 C.J.S. Agency § 380 (1973); F. Mechem, *Law of Agency* §§ 347–48 (4th ed. 1952). Moreover, under both COGSA and the contract of carriage contained in the bill of lading, the duty to provide the carrier with accurate particulars as to the weight of the cargo is expressly placed upon the shipper alone.

### B.

■ To recover indemnity from PITC, AOC must establish each of the following elements: (1) that PITC breached its warranty as to the accuracy of weight of the cargo; (2) that PITC has no defenses against its claim for indemnity; and (3) that the settlement of the fine with Customs was reasonable under the circumstances. *See Damanti v. A/S Inger*, 314 F.2d 395, 397 (2d Cir.), *cert. denied*, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64 (1963). Each of these elements will be considered separately in the discussion below.

1) *Breach of Warranty as to the Weight of the Cargo.*

■ On the basis of the record compiled in the trial of this action, there is no ques-

tion that the weight of the cargo was substantially more than the weight set forth in the bill of lading and warranted by PITC to be the correct weight of the cargo. Although PITC disputes the amount by which the weight of the cargo was in excess of the weight indicated in the bill of lading, it does not deny that the weight indicated therein, 105,000 pounds, was inaccurate and that the actual weight was considerably more than that amount. Indeed, PITC has conceded that it did not actually weigh the entire shipment prior to delivery of the cargo to the carrier but merely estimated the weight of 900 of the 1400 bales. Accordingly, the Court finds that AOC has established the first element necessary for recovery by way of indemnity against defendant PITC.

2) *PITC's Defenses to AOC's Claim for Indemnity.*

PITC first argues that AOC is not entitled to indemnity on the ground that AOC has failed to establish that the vessel is actually liable for a fine under the laws of the Ivory Coast, even though the weight of the cargo is underdeclared, where the cargo is in transit to Niger. PITC contends that where cargo is in transit to Niger, it is not subject to declaration at the port of discharge in the Ivory Coast and is therefore not liable for a fine under the Ivory Coast Customs Code.

The testimony of Mondon (the lawyer called by plaintiff to testify as an expert witness on the Ivory Coast Customs Code) clearly rebuts PITC's contention. Mondon testified that while cargo which is in transit to Niger is normally not subject to the customs duties of the Ivory Coast, where the weight of the cargo is found to be in excess of the weight specified in the bill of lading upon discharge in the Ivory Coast, Customs regards the excess cargo as being intended for illegal importation into the Ivory Coast and is authorized under the law of the Ivory Coast to subject the vessel to fines and penalties for customs fraud. While PITC takes issue with this interpre-

tation, it has provided no testimony or convincing evidence which would rebut this interpretation and support its position that in-transit cargo is not liable for fines where the weight of the cargo is understated. On the basis of the testimony of Mondon, the Court finds that the vessel was liable to fines under the laws of the Ivory Coast due to the fact that the weight of the cargo was in excess of the weight stated in the bill of lading.

PITC also contends that indemnity is improper here on the ground that AOC and its agent Transafric failed to protect its interests in the course of the negotiations with Customs. In support of this contention, PITC asserts that it was not until July 29 that it was first informed by AOC of the potential fine and that AOC and Transafric thereafter pursued negotiations with Customs and entered into a settlement of the fine without adequately consulting PITC and without obtaining PITC's prior authorization to enter into the settlement. PITC also asserts that it was misled as to the extent of the potential fine by AOC's errors in converting the value of the potential fine in CFA francs to its equivalent in United States' dollars; in particular, PITC points to the fact that AOC informed PITC that the potential fine of 156 million CFA francs was the equivalent of "in excess of $70,000" when, under the applicable conversion rate, the potential fine was actually equivalent to $655,200. PITC further asserts that AOC was primarily concerned not with PITC's interests, but with maintaining friendly relations with Customs. Accordingly, PITC asserts that AOC and Transafric hastily agreed to an improvident settlement in order to further their own interests.

On the basis of the entire record in this case, it does not appear to the Court that AOC and Transafric sacrificed PITC's interests in negotiating the settlement of the fine with Customs. While PITC complains that it was not informed that Customs intended to levy a fine until July 29, it appears from the deposition testimony of Beaucuse, the director of Transafric, that Customs did not discover the weight discrepancy until the consignee attempted to pick up some of the bales a number of weeks after the cargo was discharged at Abidjan. Moreover, it is clear that AOC was itself first informed of the problem with Customs on July 24 and that on July 26 it attempted to contact Feder at the offices of PITC in order to convey this information to him but was told that he was out of town. It further appears that AOC thereafter made every reasonable effort both to apprise Feder and PITC of subsequent developments in the Ivory Coast as soon as it received any information from Transafric, and also to solicit PITC's participation and advice in determining the course of conduct in the negotiations with Customs. That AOC was unable to speak with Feder himself on several of these occasions was not the fault of AOC. Feder's own testimony discloses that he was well aware that the DUMURRA was to be fined by Customs because the weight of the cargo shipped by PITC had been found to have been understated and that AOC had informed him that it intended to hold PITC liable for any fine that Customs ultimately levied against the vessel. In spite of Feder's obvious awareness of the gravity and the urgency of the situation in the Ivory Coast, he nevertheless chose to absent himself from the offices of PITC without authorizing anyone else at PITC to take responsibility for this matter in his absence and apparently without providing anyone with information as to where he could be contacted.

Furthermore, the Court finds that AOC had little choice but to authorize payment of the amount Customs had agreed to accept in settlement of the fine without Feder's and PITC's prior approval. On August 21, Transafric informed AOC that Customs had demanded that the settlement be paid by the following day or else Customs would take the matter to Court and that Customs had placed Transafric on a "blacklist" thereby preventing Transafric from clearing cargo from vessels at Abidjan until the settlement was paid. Although AOC attempted to obtain Feder's authorization to

pay the settlement the following day, August 22, it was informed that Feder was out of town on vacation and that he would not be returning to the offices of PITC until August 24; AOC was also informed that there was no one else at PITC authorized to approve payment of the settlement.

Although Feder contends that AOC should have withheld authorization until he returned on August 24 and should have allowed Customs to take this matter to Court in the absence of his prior authorization to pay the settlement, the alternative proposed by Feder would clearly have been untenable under the circumstances. Had AOC delayed further in authorizing payment, Transafric would have remained unable to clear vessels and cargo at Abidjan, a result which might conceivably have entailed additional damages for which PITC might ultimately be held liable. It would likewise have been impractical for AOC to withhold authorization of the settlement and permit Customs to take this matter to court in Abidjan. According to the testimony of Mondon, there were only limited options available to the Ivory Coast court in customs cases. If that court were to find the weight of the cargo to be in excess of the weight specified in the bill of lading, as would clearly have been the case here, it would not have been empowered to reduce the fine levied by Customs. Although it is true, as PITC contends, that settlement would still have been possible even if their case were taken to court in Abidjan, since it is clear that Customs was not inclined to any further reduction of the settlement amount of 15.6 million CFA francs or $65,-520, no advantage would have been gained by AOC's withholding its authorization of the settlement until Feder returned.

While AOC has stipulated that in advising PITC that the potential fine might be as much as 156 million CFA francs it incorrectly stated this amount as being equivalent to "in excess of $70,000" (when this amount was actually equivalent to $655,-200), the Court does not find that PITC was substantially prejudiced thereby. The settlement which AOC and Transafric ultimately reached with Customs for $65,520 was below what AOC had advised PITC the potential fine might be. Moreover, it should be remembered that AOC did provide Feder with the correct amount of the potential fine in CFA francs; in view of the fact that Feder himself was involved in substantial trade in West Africa and was thus no doubt aware of the conversion rate for CFA francs into United States' dollars, it is not unreasonable to assume that had he exercised reasonable diligence in this matter, he would have discovered AOC's error in converting CFA francs to dollars.

Since the Court finds that AOC took reasonable measures to protect PITC's interests in dealing with Customs and in reaching settlement of the fine, the Court concludes that PITC has no valid defenses to AOC's claim for indemnity.

### 3) *Reasonableness of the Settlement.*

■ The only remaining question is whether the settlement which AOC reached with Customs is reasonable. The reasonableness of the settlement must be measured by the extent of the financial exposure PITC would have faced had the settlement not been consummated. *Mathiesen v. Panama Canal Zone,* 551 F.2d 954, 957 (5th Cir. 1977). Applying this standard to the circumstances of this case, the Court concludes that AOC's agreement with Customs to settle the potential fine against the DUMURRA for $65,520 was reasonable.

The testimony of both Beaucuse and Mondon established that under a strict interpretation of the Ivory Coast Customs Code, Customs would have been authorized to levy a fine against the vessel on the basis of the difference in the weight disclosed between the bill of lading and the certificate of origin, 91,000 pounds. Indeed, this figure of 91,000 pounds of excess weight was used by Customs in computing the potential fine to be as much as 156 million CFA francs or $655,200. Both Beaucuse and Mondon also testified that Customs was not obligated under the Customs Code to actually weigh the cargo to determine the actual excess weight nor to base the fine

upon the actual excess weight. Nevertheless, it appears that subsequent to Customs' offer to settle the fine for 15.6 million CFA francs or $65,520, Transafric did succeed in prevailing upon Customs to reweigh the cargo. Although there is a dispute between the parties as to the weight disclosed upon reweighing of the cargo, it appears from the settlement that Customs at that time found that the weight of the cargo did not exceed approximately 157,000 pounds but that Customs refused to reduce the amount it would accept in settlement of the fine. In any event, at the trial of this action, Mondon testified that the potential fine calculated on the basis of an excess weight of 52,000 pounds (representing the differential between the lower weight of 157,000 pounds and the weight of 105,000 pounds indicated in the bill of lading), would have been 89.-239 million CFA francs, equivalent to approximately $375,000. Accordingly, whether the potential fine is considered to be $655,200 or $375,000, it is the opinion of the Court that a settlement of the fine for $65,520 was clearly reasonable in the face of this possible exposure.

Defendant PITC's remaining objections to the reasonableness of the settlement can be disposed of without extended comment.

PITC also argues that the settlement was unreasonable on the ground that the actual weight of the cargo was only 137,500 pounds and that therefore the excess weight was only 32,500 pounds. Using this figure for the excess weight of the cargo, PITC argues that the potential fine would only have amounted to 55.779 million CFA francs or approximately $234,000, and that settlement of the fine on the basis of 10% of this amount would have been equal to only 5.578 million CFA francs or $23,400.

PITC's contention that the cargo weighed only 137,500 pounds assumes an approximate weight of 75 pounds per bale for each of the 900 bales of miscellaneous clothing sold by the number of pieces. PITC has admitted, however, that it did not actually weigh these 900 bales. In his testimony, Feder himself conceded that the estimate of 75 pounds per bale for these bales was only an approximation of the weight and that the weight of individual bales could vary according to the size and texture of the articles of clothing included in a given bale.

■ PITC also contends that the settlement was unreasonable on the grounds that it was the product of duress and coercion on the part of Customs and that the imposition of a fine was merely a pretext for extortion by Customs officials. While the pressures applied by Customs in this case to encourage Transafric to agree to settlement of the fine were no doubt a bit heavy-handed and indeed somewhat oppressive, under the Act of State doctrine this Court is precluded from inquiring into the propriety and validity of actions of a foreign sovereign within its own territory. *See Alfred Dunhill of London, Inc. v. Republic of China*, 425 U.S. 682, 697, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 72–78 (2d Cir. 1977). However much the Court may deplore the actions taken by Customs in this case in imposing what must be considered an exorbitant fine in light of the infraction, the fact nevertheless remains that AOC was called upon to pay the settlement amount because of PITC's misdeclaration of the weight of the cargo—an innocent or inadvertent mistake, perhaps, but a mistake for which the shipper PITC and not the carrier was solely responsible.

■ For this same reason, the Court is unable to agree with PITC's contention that any recovery by AOC should be limited to either the forced-sale value of the cargo of used clothing in the Ivory Coast, approximately $8,850, or the CIF value of the cargo, $44,200. While the Court is aware that the amount of the settlement exceeds the value of the cargo itself by approximately 50%, the limitations proposed by PITC would require AOC to shoulder liability for PITC's mistake. Since the underdeclaration of the weight of the cargo was the result of PITC's negligence and not the fault of the carrier, it would clearly be unfair to limit AOC's recovery of indemnity from PITC.

## II. *PITC's Claim for Offset of Freight Overcharge.*

At the conclusion of the trial, PITC moved to amend its answer to assert a claim to offset amounts which it contends it was overcharged by AOC for freight in connection with this shipment against any allowance of indemnity to AOC.

PITC asserts that AOC subsequently billed PITC for additional freight for 52,000 pounds of cargo based on the differential between the weight of 105,000 pounds indicated in the bill of lading (on which PITC had initially paid freight) and the weight of 157,000 pounds which AOC asserted to be the actual weight of the cargo established upon reweighing of the cargo in the Ivory Coast. PITC paid the additional freight charge on the advice of counsel in order to obtain release of the cargo to the consignee. However, PITC contends that it has not conceded that the weight of the cargo was actually 157,000 pounds. On the contrary, PITC contends that it has consistently maintained that the cargo weighed only 137,500 pounds. Based on this figure, PITC contends that it should only have been charged additional freight for 22,500 pounds and, accordingly, seeks to recoup freight of $1,037.53 which it claims it was overcharged by AOC.

In order to succeed on this claim, PITC must carry its burden of establishing that the actual weight of the cargo was 137,500 pounds. That it cannot meet this burden is evident since, by its own acknowledgment, it never actually weighed the entire cargo. As noted above, PITC's claim is based solely on the assumption that the 900 bales (which it did not weigh) actually weighed the estimated 75 pounds per bale. Although PITC challenges the reliability of the weight of 157,000 pounds asserted by AOC to have been the weight disclosed on reweighing of the cargo in the Ivory Coast, this figure is certainly no less reliable than PITC's own "approximated" weight. Since PITC cannot establish its contention that the cargo weighed only 137,500 pounds by a fair preponderance of the credible evidence, its claim for offset must fail.

Accordingly, the Court finds in favor of AOC on its claim for indemnity against PITC for the amount which AOC paid in settlement of the fine imposed by Customs, and against defendant PITC on its claim for offset for excess freight overcharges.

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

Settle judgment on notice.