**OXFORD SHIPPING CO., LTD.,**
Plaintiff, Appellant,

v.

**NEW HAMPSHIRE TRADING CORP., et
al., Defendants, Appellees.**

**OXFORD SHIPPING CO., LTD.,**
Plaintiff, Appellee,

v.

**NEW HAMPSHIRE TRADING CORP., et
al., Defendants, Appellees.**

**Avon Trading Corp., Defendant,
Appellant.**

Nos. 82–1336, 82–1381.

United States Court of Appeals,
First Circuit.

Argued Oct. 7, 1982.

Decided Dec. 28, 1982.

Rehearings Denied Jan. 20, 1983.

Frank H. Handy, Jr., Boston, Mass., with whom Kneeland, Kydd & Handy, Boston, Mass., was on brief, for Oxford Shipping Co., Ltd.

John P. Griffith, Nashua, N.H., with whom Hamblett & Kerrigan, Nashua, N.H., was on brief, for appellant Avon Trading Corp.

George J. Basbanes, Lowell, Mass., for New Hampshire Trading Corp. and Frederick W. Gendron.

Richard A. Dempsey, Boston, Mass., with whom Leo F. Glynn and Glynn & Dempsey, Boston, Mass., were on brief, for appellee Tager S.S. Agency.

Before PECK,* Senior Circuit Judge, CAMPBELL and BREYER, Circuit Judges.

* Of the Sixth Circuit, sitting by designation.

BREYER, Circuit Judge.

Oxford Shipping Co., Ltd. ("Oxford"), is a subsidiary of a large Hong Kong commercial firm. Oxford's assets consist principally of one cargo ship, the "Eastern Saga." Oxford claims that it was hurt when its ship was seized by South Korean authorities as a result of a scheme to cheat a Korean firm, Yulsan. Yulsan had bought about 20,000 tons of scrap metal, which applicable bills of lading represented to be aboard the "Eastern Saga," but the ship actually contained only about 17,000 tons of metal.

Oxford brought suit to recover damages in New Hampshire federal district court. It sued Avon Trading Corporation ("Avon"), the shipper that used the "Eastern Saga" to transport the metal; New Hampshire Trading Corp. ("NHT"), a scrap dealer that sold scrap to Avon; Frederic Gendron, the president of NHT; and Tager Steamship Agency ("Tager"), an agent retained to issue bills of lading and perform other tasks associated with loading and shipping the scrap.

Since Oxford itself seems to have been innocent of wrongdoing (although the captain and crew of its ship may have known of the plot), while several of the defendants seem to have been guilty of conduct ranging from simple breach of fiduciary duty to what approaches criminal behavior, one might believe at first glance that it would be fairly easy for Oxford (the company and its shareholders) to recover for the harms suffered. The record reveals, however, a highly complicated set of legalistic arguments, made by the defendants' lawyers and by Oxford's lawyers in response, that led the district court to conclude that the defendants were entitled to judgment on all counts. Oxford appeals. Our review of the case convinces us that the law should, and does, correspond with one's elementary sense of justice: namely, as between Oxford and most of these defendants, the defendants rather than Oxford and its shareholders should pay for the damage caused.

## I

The complex set of facts underlying this litigation can be simplified as follows. Avon contracted in 1978 to sell roughly 20,000 tons of scrap metal to Yulsan. Avon subchartered the "Eastern Saga" from Transamerica Steamship Corp., which had previously subchartered the vessel from several other firms which in turn had chartered it from Oxford. The evidence before the district court indicated that Avon tried to cheat Yulsan by only loading some 17,000 tons of scrap on board. In particular, after buying an initial quantity of scrap elsewhere, Avon purchased roughly 7,000 tons of scrap from NHT, but represented the amount as over 10,000 tons. Avon used various false documents to conceal the fraud, including bills of lading issued by Tager that overstated the weight of the scrap by several thousand tons. In issuing the bills of lading, Tager relied upon a letter signed by NHT's Gendron concerning the scrap weight, but Gendron testified at trial that the letter was written by Avon officials and signed by him at their behest, and that he was not aware that it misrepresented the amount of scrap sold by NHT to Avon.

The captain and first officer of the "Eastern Saga," who were agents of Oxford, probably knew that the ship was carrying too little scrap, for they were approached by Avon officials at several points with schemes to cover up the shortfall by taking on water ballast and dumping it in South Korea while the ship was being unloaded. They refused to go along with the plot, but they do not appear to have informed either their superiors at Oxford or Yulsan itself of what was going on. When the ship reached South Korea the short-weighting was quickly discovered, and Yulsan had the "Eastern Saga" seized by South Korean port authorities. The fact that Yulsan had accepted the bills of lading, however, apparently triggered automatic payment through letters of credit, so Yulsan appears to have had to pay for the missing metal. Yulsan began litigation in South Korea against Oxford and other parties to recover the value of the shortfall, and Oxford was able to extract its ship in the interim only by posting a security bond worth approximately $200,000.

Oxford began its suit in federal district court to recover for various losses incurred by the seizure of its ship and for the potential liability created by Yulsan's claims against it. Oxford sought to recover from Avon, NHT, Gendron, and Tager for breach of contract, negligence, and fraudulent misrepresentation in connection with Avon's attempted fraud against Yulsan. After a four-day bench trial, the district court entered judgment against Oxford on every claim.

## II

### Claims against Avon

Oxford's claims against Avon rest primarily upon its contention that, in providing false information for the bills of lading, Avon breached its contractual obligations to Oxford. We believe that the district court properly characterized the claim as one arising under the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 *et seq.* ("COGSA"). COGSA provides in part that

[t]he shipper shall be deemed to have guaranteed to the carrier the accuracy at the time of shipment of the marks, number, quantity, and weight [of the cargo], as furnished by him; and the shipper shall indemnify the carrier against all loss, damages, and expenses arising or resulting from inaccuracies in such particulars.

46 U.S.C. § 1303(5). The facts make clear that Avon breached its duty to supply accurate information about the weight of the cargo. In fact, Avon deliberately overstated the weight. Yet the district court held that Avon need not indemnify Oxford for its "loss, damages, and expenses . . . resulting from [those] inaccuracies" (other than Oxford's potential liability to Yulsan), because Oxford's officers on the "Eastern Saga" knew about Avon's fraud. This fact, in the court's view, "equitably estopped" Oxford from recovering.

Although the factual findings of the district court concerning the knowledge of Oxford's officers are not clearly erroneous, Fed.R.Civ.P. 52(a), the court erred in its legal conclusion that those facts supported the application of equitable estoppel. As an initial matter, it is far from clear that the doctrine of equitable estoppel applies under § 1303(5); on its face, § 1303(5) imposes absolute liability on a shipper who supplies a carrier with inaccurate information about a cargo, without regard to the carrier's conduct. Moreover, even if it were assumed that the common law defense of equitable estoppel were incorporated into the statutory cause of action created by § 1303(5), the defense simply has no application here. Traditionally, the doctrine of equitable estoppel

> operates to preclude a party [who has made representations of fact through his words or conduct] '[f]rom asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right . . . .'

*Precious Metals Associates, Inc. v. Commodity Futures Trading Commission,* 620 F.2d 900, 908 (1st Cir.1980), *quoting* 2 J. Pomeroy, *Equity Jurisprudence* § 804, at 1421–22 (3d ed. 1905); *see, e.g., Lavin v. Marsh,* 644 F.2d 1378 (9th Cir.1981). In this case, neither Oxford nor its agents made any representations to Avon concerning the cargo, nor did Avon rely on any representations in pursuing its fraudulent scheme, nor would it have had the requisite good faith had it done so. Insofar as Oxford's agents failed in their duty to inform Oxford (and Yulsan) about Avon's conduct, Avon was helped rather than hindered by their conduct.

The doctrine most on point here is not that of equitable estoppel, which we cannot find to have been applied in a case like this one, but the defense of "acquiescence." That defense bars an indemnitee from obtaining indemnification when the indemnitee knowingly acquiesces in the indemnitor's wrongful conduct. *See, e.g.,* *Missouri Pac. R.R. Co. v. Winburn Tile Mfg. Co.,* 461 F.2d 984, 989 (8th Cir.1972); *Missouri Pac. R.R. Co. v. Arkansas Oak Flooring,* 434 F.2d 575, 578–79 (8th Cir.1970). As is true of "equitable estoppel," we have found no case implying this defense under COGSA. In any event, we do not believe that the defense bars recovery by an innocent principal-indemnitee against a culpable agent-indemnitor merely because another of the principal's agents has knowledge of the indemnitor's wrongdoing. *See Becker v. Central Telephone and Utilities Corp.,* 365 F.Supp. 984, 988–89 (D.S.D.1973) (acquiescence requires awareness of dangerous situation created by indemnitor, and " 'awareness' denotes something more than imputed legal knowledge' "), *vacated on other grounds sub nom. Becker v. Black & Veatch Consulting Engineers,* 509 F.2d 42 (8th Cir.1974); *cf. Standard Oil Co. of California v. Intrepid, Inc.,* 26 Cal.App.3d 135, 139–40, 102 Cal.Rptr. 604, 607–08 (1972) (negligence of ship owner precludes recovery from indemnitor only if ship owner's conduct prevented or substantially handicapped indemnitor in performing his duties).

*Becker* holds explicitly, and *Standard Oil* implicitly, that an indemnitee is not barred from recovery by mere imputed knowledge of an indemnitor's negligence. If so, so much the less should an indemnitee be barred by imputed knowledge of an intentional *fraud.* Cases barring recovery under the acquiescence doctrine frequently have involved some degree of joint fault between the indemnitor and the indemnitee. There is no degree of joint fault here, for the only failing outside of Avon's own intentional misconduct is the breach by Oxford's agents of a duty to inform that they owed to *Oxford* rather than to Yulsan. As between an innocent principal whose loss is caused in part by an unfaithful or negligent agent, and another agent who has injured the principal through willful misconduct, the latter rather than the former ought to bear the burden of the loss. This case does not present any special circumstances suggesting a contrary result. We therefore

hold that Oxford was not "equitably estopped" or barred by "acquiescence," and that it is entitled to recover from Avon under the indemnity provision of COGSA.

The district court dismissed Oxford's further negligence and fraud claims against Avon on the ground that COGSA preempted these common law bases of liability. While several lower court decisions support this conclusion, see *Miller Export Corp. v. Hellenic Lines, Ltd.*, 534 F.Supp. 707, 710 (S.D.N.Y.1982); *National Automotive Publications, Inc. v. United States Lines, Inc.*, 486 F.Supp. 1094, 1099 (S.D.N.Y.1980); *B.F. McKernin & Co. v. United States Lines, Inc.*, 416 F.Supp. 1068, 1071 (S.D.N.Y.1976), we need neither accept nor reject these decisions. Since Oxford's COGSA claim is an adequate basis for the relief it seeks against Avon, we need not reach the issue.

### III

#### *Claims against NHT and Gendron*

Oxford's claims against NHT and its president Gendron involve the same issues and concern the same conduct, namely Gendron's letter to Tager stating that NHT had loaded over 10,000 tons of scrap on the ship. As Gendron apparently knew, NHT had, in reality, loaded only some 7,400 tons.

Oxford based its claim primarily on the theory that NHT, through Gendron, had fraudulently misrepresented the weight of the cargo. The district court held that under New Hampshire law, a plaintiff must show an intent to deceive in order to recover for fraud. See *Hanson v. Edgerly*, 29 N.H. 343 (1854); *Lord v. Colley*, 6 N.H. 99 (1833). It found no such intent here. Gendron testified that the misleading letter was typed by an *Avon* official, that it was placed before him, and that he signed it without looking closely at it. Gendron testified that he did not know he was helping Avon perpetrate a fraud.

The district court credited enough of this testimony to find that Gendron lacked the requisite intent to deceive. The district court saw Gendron testify. Judgments of credibility are peculiarly within its province; they will not be disturbed by this court without a compelling showing of error, and no such showing has been made. See Fed.R.Civ.P. 52(a); *Pepsi-Cola Metropolitan Bottling Co. v. Pleasure Island, Inc.*, 345 F.2d 617, 621 (1st Cir.1965). We therefore reject Oxford's efforts to have us overturn as clearly erroneous the court's finding that Gendron was "an innocent dupe"—difficult as it may be to join in that characterization on the basis of the paper record before us. Oxford might have found it easier to prove that Gendron simply acted recklessly, with conscious indifference to the truth of the statements to which he affixed his signature; such a showing might have been sufficient under New Hampshire law. See *Manchester Bank v. Connecticut Bank and Trust Co.*, 497 F.Supp. 1304, 1316–17 (D.N.H.1980) (applying New Hampshire law); *Saidel v. Union Assurance Society*, 84 N.H. 232, 149 A. 78 (1930). However, Oxford did not pursue that theory of liability below, and we therefore do not consider it further (if Oxford is even raising it) on appeal. See *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979).

Oxford also attempted to recover from Gendron and NHT on a negligence count. The district court held that NHT, as a supplier to a shipper, owed no duty of care to Oxford, the carrier whose services the shipper hired. The district court's holding is supported by precedent. See *Atlantic Overseas Corp. v. Feder*, 452 F.Supp. 347, 351 (S.D.N.Y.) (freight forwarder), *aff'd*, 594 F.2d 851 (2d Cir.1978), *cert. denied*, 444 U.S. 829, 100 S.Ct. 55, 62 L.Ed.2d 37 (1979). In light of Oxford's failure to make any argument whatsoever on this point on appeal, we shall not disturb that holding.

### IV

#### *Claims against Tager*

Oxford's claims against Tager, while asserted under headings of "contract," "negligence," and "fraudulent misrepresentation," come down to an assertion that Tager, in issuing false bills of lading, breached

a fiduciary duty that it owed to Oxford. In making a "contract" claim, Oxford essentially seeks to find an implied contractual term forbidding Tager from issuing a false bill of lading; in making its "tort" claim, it seeks to find a negligent act. The legal claim that Oxford asserts, however, is simply founded upon basic principles of the law of agency. Tager does not dispute that it was an agent of Oxford, hired to arrange for supplies and services for the "Eastern Saga," to prepare government documentation, to enter and clear the ship through customs, and to prepare bills of lading. As Oxford's agent Tager owed Oxford a "fiduciary" duty of care. See Restatement (Second) of Agency § 379.

The district court found that Tager had indeed breached its fiduciary obligations in two respects. First, Oxford's captain asked Tager to put in the bill of lading a statement that "weight, quantity and quality" were "unknown," but Tager failed to do so. The court found, however, that even if this clause had been inserted, Oxford would have remained liable and its ship still would have been seized. The court therefore concluded that no causal connection existed between the alleged breach and Oxford's injury. Because we find below that Oxford is entitled to recover against Tager on other grounds, it is unnecessary for us to determine whether the court's causation holding is erroneous.

Second, the court found that Tager breached its fiduciary obligations by failing accurately to determine how much scrap had been loaded before making out the bill of lading. The court went on to hold that Oxford nonetheless could not recover because of the "contributory negligence" of Oxford's captain and first officer—negligence that consisted of their failing to tell Oxford or Yulsan about the plot. We believe that, in this respect, the court erred.

 The legal question presented is simply whether an innocent principal (Oxford) is barred from collecting for damages caused by one set of negligent agents (Tager) because another set of agents has also been negligent (the captain and first offi-

cer)—in other words, whether one agent's contributory negligence is to be imputed to his principal to bar the principal from recovering from another negligent agent. The courts that have faced this question have divided in their responses. Compare Buhl v. Viera, 328 Mass. 201, 102 N.E.2d 774 (1954) (contributory negligence of one agent not imputed to bar recovery by principal against second agent); Brown v. Poritzky, 30 N.Y.2d 289, 283 N.E.2d 751, 332 N.Y.S.2d 872 (1972) (same); and Zulkee v. Wing, 20 Wis. 408 (1866) (same), with Insurance Co. of North America v. Anderson, 92 Idaho 114, 438 P.2d 265 (1968) (contributory negligence imputed), and Capitola v. Minneapolis, S.P. & S.S.M. Railroad Co., 258 Minn. 206, 103 N.W.2d 867 (1960) (same). We believe that the better reasoned cases are those that would allow recovery in these circumstances. We also believe that those are the cases that the New Hampshire Supreme Court would follow.

Our conclusion rests on our view that in the cases in which the contributory negligence of one agent has been held to bar an innocent principal from recovering against another, the courts have simply reasoned by analogy from a different situation without recognizing the difference. The different situation is that in which the principal seeks to recover from a third party, such as when Firm A seeks to recover from a driver of a car who negligently collides with Firm A's truck. In such circumstances, courts often have held that the contributory negligence of Firm A's driver, if sufficient to bar the driver's own recovery, is sufficient to bar recovery by Firm A as well. The servant's or agent's contributory negligence is "imputed" to the master or principal. See Restatement (Second) of Agency § 317 (principal-agent); Restatement (Second) of Torts § 486 (master-servant).

 This general rule of imputation presumably is grounded in the desire to require the principal to recover from his agent, rather than allowing him to pursue the third party as well. If so, that rationale is defeated rather than furthered if two negligent agents are allowed to impute each

other's negligence and bar recovery against either: instead of being remitted to his agents for relief, the principal is barred from recovering against them altogether. We have not found any other plausible rationale underlying the imputing of contributory negligence that would require imputation in this case. Given the basic legal rule that a principal can recover for damages caused by an agent's breach of his duties of trust and care, we see no reason why the principal should be barred by the fact that injuries were caused by two agents or two sets of agents. To allow each to set up that breach of duty of the other as a defense to the principal's claim is, in effect, to disallow the principal's recovery where more than one agent defaults in his duty. We see no rational basis for such a distinction.

Given the lack of a rational basis for imputing the agents' contributory negligence to the principal here, and the New Hampshire Supreme Court's flat statement that the " 'waning defense of contributory negligence' should not be extended by imputation," *Glidden v. Butler*, 288 A.2d 695, 696, 112 N.H. 68 (1972), we believe that the New Hampshire courts would follow *Buhl, Brown,* and *Zulkee* here, and would not impute the captain's or first officer's negligence to Oxford to bar Oxford's recovery against its agent Tager. In light of this holding we need not reach Oxford's claim based on "fraudulent misrepresentation," for Oxford already had an adequate basis for recovering against Tager.

### IV

Avon cross-appeals from the district court's judgment. Avon notes that the district court stated that "in the event Oxford is required to pay over [the amounts due Yulsan] as a result of the cargo shortage, it is entitled to indemnification in this amount from Avon." Avon claims that this sentence is an "advisory opinion" in violation of Article III of the Constitution.

Since the judgment appealed from was in Avon's favor, and since the statement made was in no sense necessary to that judgment,

the statement was dictum. There is no known basis for an appeal from a dictum. In any event, our present opinion makes clear that Oxford could recover for the amounts at issue. Thus, we need not spend time trying to develop a theory that might support Avon's right to appeal, for, regardless, Avon would lose.

### V

Because of the confused nature of the arguments on this appeal and the state of the record, we wish to make clear how the district court is to proceed on remand. The liability of Avon and Tager for damages has been established. The two defendants are jointly and severally liable for all of Oxford's damages. *Cf. Mihoy v. Proulx,* 113 N.H. 698, 313 A.2d 723 (1973); *Tetreault v. Gould,* 83 N.H. 99, 138 A. 544 (1927). Thus, the court need only determine the amount of damages.

It is not clear at this stage of the proceedings precisely what Oxford's damages consist of. Apparently, Oxford lost the use of its ship while it was being held in South Korea, and may have incurred other expenses as well. But, one expense that has not yet been incurred consists of money that *might* have to be paid by Oxford to Yulsan to reimburse Yulsan for its losses. Ordinarily, Oxford would not be entitled to indemnification or any other recovery for the anticipated amount of its liability to Yulsan until that liability is fixed by, for example, entry of a final judgment. *See Mitsui Steamship Co. v. Jarka Corp. of Philadelphia,* 218 F.Supp. 424 (E.D.Pa.1963). No such Korean judgment has yet been entered.

Although neither Avon nor any of the other appellees has raised the issue, we note that in *A/S J. Ludwig Mowinckles Rederi v. Tidewater Construction Corp.,* 559 F.2d 928 (4th Cir.1977), the Fourth Circuit effectively dismissed an indemnification claim because no judgment or settlement had been reached in the litigation for which indemnification was sought. The court stressed, however, that "[w]hether an indemnification issue is ripe for adjudication depends

on the facts and circumstances under consideration," *id.* at 932, and it based its decision on the possibility that the parties seeking indemnification might not have any damage claim at all against the indemnitor if the other litigation concluded in their favor.

Here, because Oxford is conclusively entitled to recover for elements of damage that already have been fully incurred, the argument for dismissing Oxford's claims related to Yulsan's suit is less compelling. Instead, given the present posture of the case, the practical solution is for the district court to award damages at the present time for all other elements of damage proved by Oxford, and to defer entry of a damage award for Oxford's anticipated liability to Yulsan until that liability is finally established, if in fact it is. *Cf. Moran Towing & Transportation Co. v. United States,* 56 F.Supp. 104 (S.D.N.Y.1944) (case retained on docket but trial stayed until liability established). Whether the format and outcome of the South Korean litigation will give rise to any further issues concerning the appropriate relief in this forum is not a question that we address. The district court and the parties will be able to consider any such issues if and when they arise. To forestall unnecessary confusion, the clerk of this court shall forward a copy of this opinion to the South Korean court before which the related litigation is pending.

*The judgment of the district court in favor of Avon Trading Corporation and Tager Steamship Authority is reversed. The cause is remanded for further proceedings consistent with this opinion.*