In re CAREY
TRANSPORTATION, INC., Debtor.

CAREY TRANSPORTATION,
INC., Plaintiff,

v.

The GREYHOUND
CORPORATION, Defendant.

Bankruptcy No. 85 B 10460.
Adv. No. 85–6536A.

United States Bankruptcy Court,
S.D. New York.

April 15, 1987.

See also, Bkrtcy., 50 B.R. 203.

Shea & Gould, New York City, for debtor; Stuart Hirshfeld, Ronald H. Alenstein and Michael Emrich, of counsel.

Mailman & Gigante, New York City, for Greyhound; Alexander Gigante, of counsel.

## DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

### I. *Introduction*

Carey Transportation, Inc. ("Carey") commenced an adversary proceeding against Greyhound Corporation ("Greyhound") seeking an order directing Greyhound to indemnify Carey for a pro-rata portion of a settlement agreement, reached between Carey and the Triborough Bridge and Tunnel Authority ("TBTA"). Carey alleges that indemnification is mandated by the terms of a contract which defines the rights and liabilities of Carey, Greyhound, and Carey's current owner, the Schiavone Corporation ("Schiavone"). Alleging that there are no genuine issues of material fact, Carey moved for summary judgment pursuant to Rule 56 of the Fed.R.Civ.P. and Rule 7056 of the Fed.R.Bankr.P.

Greyhound responded with a cross-motion for summary judgment seeking dismissal of Carey's complaint, or in the alternative denying Carey's request for summary judgment.

Based on the undisputed facts presented this Court finds that, in accordance with the applicable standards, Greyhound did not satisfy its contractual obligation to defend Carey against the TBTA demand for payment, though timely notified thereof; Carey was potentially liable to the TBTA for the disputed claim; and Carey's settlement of that claim was reasonable. Therefore Carey's request for summary judgment is granted.

### II. *Background*

On April 4, 1985 Carey filed a chapter 11 petition for reorganization under the Bankruptcy Code ("Code"). Carey is currently operating as a debtor in possession pursuant to §§ 1107 and 1108 of the Code.

In 1982 Greyhound, Carey's previous owner, and Schiavone, Carey's present owner, entered into a Stock Purchase Agreement ("Transfer Agreement") pursuant to which Schiavone purchased Carey from Greyhound. From 1952 through March 31, 1984 Carey operated from premises licensed from the TBTA known as the East Side Airlines Terminal ("Terminal").

Under a 1952 lease which first governed the Carey-TBTA relationship, rent for the Terminal was based on, among other things, a portion of Carey's revenues from passenger fares. Carey charged passengers different fares including "adult fares" and "commutation fares." This lease applied separate and different formulae, with respect to these two categories, to determine Carey's rent. When the 1952 lease expired Carey continued to occupy the Terminal under a "proposed license agreement," entered into in 1974. Under this agreement the practice of charging rent, determined by applying the separate and different formulae, was continued.

On January 18, 1977 Carey and TBTA entered into a license agreement which superseded the "proposed license agreement" and permitted Carey to continue occupying the Terminal. By the terms of this agreement Carey's rent was based on "adult fares" and no mention was made therein of "commutation fares." When Schiavone commenced its ownership of Carey in 1982 it was this license agreement, already in effect, which controlled Carey's occupation of the Terminal.

Carey ceased occupying the Terminal on March 31, 1984. Subsequent to vacating it the TBTA assessed Carey for an alleged $392,773 underpayment of rent for the period encompassing November 16, 1976 through March 31, 1984. This sum was determined from an audit of Carey's books and records conducted on behalf of the TBTA. On July 17, 1984 the TBTA formally demanded payment of that sum, plus interest, from Carey.

Carey calculated that $299,833 of the total sum demanded was allocable to the period during which Greyhound owned Carey and was occupying the Terminal. Carey put Greyhound on notice of the TBTA claim by letter dated September 7, 1984. Enclosed with that letter was an August 3, 1984 memorandum by Carey's former comptroller which states:

> Per our discussion, there is a significant balance due us by Greyhound:
>
> \* \* \*
>
> 3. East Side Airlines Terminal Rent – per audit
> $299,833
>
> \* \* \*
>
> The East Side Airlines Terminal Rent has arisen from an audit performed for the period of 11/16/76 to 3/31/84. . . . The "Greyhound amount" was determined by prorating the 7 1/2 year period of the audit between the Greyhound period (6 years) and the Schiavone period (1 1/2 years):
>
> Claim $392,773 ÷ 7.5 × 6 = $314,218 = Greyhound
> $392,773 ÷ 7.5 × 1.5 = $78,555 = Schiavone
>
> The Greyound amount was then lowered by balance [sic] of the "Unrecorded Liability Risk" agreement contained in the purchase contract. . . .

In addition Carey enclosed a two page analysis of the figures from which the TBTA calculated the additional rent. Carey's notice letter to Greyhound concluded by stating: "We are sending you this material for *settlement purposes* only and it is not intended for this material to be used in the litigation [ (emphasis added) ]."

Paragraph 10.1 of the Stock Purchase Agreement pursuant to which Carey's ownership was transferred to Schiavone states in relevant part:

> Seller [ (Greyhound) ] hereby indemnifies and agrees to hold harmless Buyer and the Companies [ (Schiavone and Carey) ] against and in respect of the following (hereinafter called a "Loss" or "Losses"):
>
> Any and all damages, costs, expenses (including attorneys' fees), losses or deficiencies paid or suffered by Buyer

> or any of the Companies (*including without limitation, all damages, costs, expenses and losses arising out of any and all* actions, suits, proceedings, *demands*, penalties, assessments, judgments *and settlements involving claims of third parties against the Companies or Buyer* ), resulting from, involving or reflecting ... (iii) any event occurring, or state of facts coming into existence, before the Closing Date ... provided this indemnity shall apply only if the aggregate Loss or Losses exceed $25,000, and then shall apply to all Loss or Losses, including the first $25,000 of Loss or Losses. [ (Emphasis added) ].

Paragraph 10.4 of the Transfer Agreement states:

> Without in any way limiting the scope of Sections 10.1 and 10.2, Seller hereby agrees that if an action, suit, proceeding or *demand* against which Seller is obligated to indemnify Buyer and the Companies, pursuant to this Section 10 involves any uninsured claim, or any claim as to which any insurance company refuses to assure the defense, Seller *will promptly assume the defense against such* action, suit, proceeding or *demand at its sole cost and expense,* will indemnify and hold harmless Buyer and Companies against the cost and expense of such defense and will promptly pay all penalties, assessments, judgments and *settlements* imposed or made in connection with the foregoing. [ (Emphasis added). ]

Despite these express contractual provisions, Greyhound did not assume the defense against the TBTA demand. Instead, by letter dated October 23, 1984 Greyhound acknowledged receipt of Carey's notification of the claim by the TBTA, and responded in relevant part:

> To the extent that the TBTA audit pertains to the pre-sale period, the claim involves erroneously assessed fees attributable to "commutation passengers" and possibly the lumping of half fares that result in minor discrepancies of fares reported to TBTA. The 1974 TBTA

agreement provides for specific fees with regard to commutation and children's fares. The January 1977 agreement specifically excluded any fees for commutation and children's fares. The 1977 agreement was negotiated with TBTA by our management and counsel for TBTA and no doubt exists about the miscalculation of fees by TBTA.

Carey was audited during the 1977 agreement and at no time did TBTA challenge agreement not to pay on commutation tickets. It appears that only because of Carey's new agreement with TBTA and the early withdrawal from the East Side Airlines Terminal has this unfounded assessment been attempted for pre–1982 matters.

We hereby request and demand that neither Carey Transportation, Inc. nor Schiavone Carrier Corporation take any action or delay in protecting our interests by inaction with respect to this unfounded claim for pre–1982 fees.

Thus Greyhound's conduct at this point consisted solely of disagreement rather than affirmative activity.

On January 11, 1985 TBTA commenced an action against Carey in order to collect the disputed sum. One week later Carey entered into a Settlement Agreement with the TBTA pursuant to which Carey agreed to make twelve monthly installment payments of $32,775.25 each (for a total of $393,303) to resolve the TBTA claim. These payments were to commence in May of 1985.

On February 5, 1985 Carey notified Greyhound of the TBTA settlement. Expressly referring to the provisions of the Transfer Agreement, Carey demanded payment of $303,000 from Greyhound.[1] In a response letter Greyhound rejected Carey's demand.[2]

As noted above Carey filed its chapter 11 petition on April 4, 1985. Carey subsequently filed a motion pursuant to § 365 of the Code whereby it sought authority to assume the Settlement Agreement. Greyhound concedes having received a copy of Carey's § 365 application, along with notice of the hearing date, even though Greyhound was not listed on the proof of service list. (Greyhound's Local Rule 13(h) Statement at ¶ 14–15).

At the hearing on Carey's motion to assume the Settlement Agreement no one, including Greyhound, voiced any opposition to Carey's assumption of it. This Court authorized Carey to assume the Settlement Agreement.

Thereafter Carey commenced this proceeding in order to secure indemnification from Greyhound for that portion of the settlement attributable to the period that Greyhound occupied the Terminal. Heretofore pursuant to prior motion practice under 28 U.S.C. § 157(b)(3), it was determined by separate order dated November 9, 1985 that the instant proceeding is a core proceeding.

### III. *Contentions of the Parties*

In its motion for summary judgment Carey contends that Greyhound had a contrac-

---

**1.** The February 5, 1985 letter reads in relevant part:

"Carey Transportation, Inc. or its affiliate, Schiavone Carrier Corp., has previously provided notice to you of the claims of the TBTA. Carey Transportation, Inc. has calculated that of the $393,000, to be paid to the TBTA as aforesaid, an amount equal to $303,000 is owed from the period when the Greyhound Corporation owned and controlled Carey Transportation, Inc.

Accordingly, pursuant to the relevant provisions of the Stock Purchase Agreement between The Greyhound Corporation and Schiavone Carrier Corp. dated May 4, 1982, demand is hereby made for the payment of $303,000 to Carey Transportation, Inc."

**2.** The response letter dated March 1, 1985 reads in relevant part:

"We were previously advised of this claim by your firm's September 7, 1984, letter.... After investigation of the claim, we advised The Schiavone Corporation by our October 23, 1984, letter ..., that we believed the claim to be baseless, gave specific reasons for Greyhound's belief and instructed Carey and Schiavone Carrier Corporation, not to take any action which would prejudice Greyhound's position. Notwithstanding the foregoing, Carey appears to have "settled" TBTA's claim for an amount apparently in excess of TBTA's demand. This was done without any further notice to or consultation with Greyhound.

In light of the foregoing, we reject your demand for payment of any part of the alleged settlement."

tual obligation to intervene on behalf of and defend Carey upon being notified of the TBTA's demand for payment. Due to Greyhound's subsequent failure to do so, Carey alleges that it need only establish its potential liability to the TBTA, and the reasonableness of the Settlement Agreement, in order for Greyhound to be found liable for the pro-rata portion of that agreement allocable to Greyhound. Alleging that both of these requirements have been met, Carey seeks a summary judgment order finding Greyhound liable to Carey for the sum in dispute.

In its cross-motion for summary judgment Greyhound alleges that in order for Carey to recover from Greyhound it must establish actual not potential liability. According to Greyhound actual liability never existed. Moreover Greyhound contends that even were sums owed by Carey under the license agreement, such liability was not enforceable due to the alleged passage of the statute of limitations which governed the claim in dispute. In addition Greyhound argues that Carey is not entitled to any indemnification as the settlement sum was paid in return for annual toll concessions from the TBTA totaling $268,-000. Accordingly, Greyhound alleges that the settlement was not reasonable. In light of these arguments Greyhound seeks a summary judgment order dismissing Carey's complaint, or in the alternative, denying Carey's motion for summary judgment.

## IV. *Issue*

The primary issue raised is whether an indemnitee need only establish its potential liability to a third-party, in order to recover from its indemnitor for a settlement of the third party's claim, when the indemnitor failed to take any affirmative action in defending that claim, though timely notified of the claim and contractually obligated to defend against it.

## V. *Discussion*

### A. *The Applicable Standards*

When an indemnitee settles an action commenced by a third party prior to judgment, the indemnitee's right to recover from an indemnitor will, depending on the circumstances, be based in part on establishing either the indemnitee's actual or potential liability. *Atlantic Richfield Co. v. Interstate Oil Transport*, 784 F.2d 106, 110–11 (2nd Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986). In *Atlantic Richfield* the Court of Appeals for the Second Circuit stated:

> Notice sufficient to give the indemnitor a meaningful opportunity to defend is the indispensable element to be proven by the party seeking indemnity. *If the indemnitor declines either to approve the settlement or to take over the defense, the indemnitee is required to prove only its potential liability to the plaintiff.* [ (emphasis added) ].

*Id.* at 113.

### 1. The Potential Liability Standard Applies

### (a) Greyhound Initially Received Sufficient Notice Triggering Its Obligation to Defend Carey

*Atlantic Richfield* involved an attempt by the indemnitee to recover from its indemnitor the amount of a settlement agreement reached with a third-party. Applying the above criteria the Court held that the indemnitor was denied its "meaningful opportunity to assume the defense" when the indemnitee only gave the indemnitor one day's notice of the settlement prior to it being entered into. *Id.* at 112–13. Accordingly the Court applied the actual liability standard in determining the indemnitee's right to indemnification. *Id.* at 113.

In the instant case on the other hand, pursuant to the express terms of the Transfer Agreement, Greyhound agreed to "promptly assume the defense" of any "action, suit, proceeding or *demand* against which Seller is obligated to indemnify Buyer and the Companies...." (Emphasis added). Transfer Agreement at ¶ 10.4. Under the Transfer Agreement, Greyhound was obligated to indemnify Carey for "all damages, costs, expenses and losses aris-

ing out of any and all ... *demands ... and settlements involving claims of third parties....* [ (Emphasis added) ]" resulting from "any event occurring or state of facts coming into existence, before the Closing Date...." *Id.* at ¶ 10.1.

Where an indemnitor has a contractual duty to defend he must do so as long as the allegations in a case could possibly result in liability covered by the contract at issue. *See American Home Prod. v. Liberty Mut. Ins. Co.,* 565 F.Supp. 1485, 1500 (S.D.N.Y.1983), *modified,* 748 F.2d 760 (2nd Cir.1984). An indemnitor who fails to meet its contractual obligation to defend an indemnitee, after being tendered the defense, is estopped from criticizing the indemnitee's strategy in settling the disputed claim. *Dominic v. Hess Oil Virgin Islands Corp.,* 624 F.Supp. 117, 120 (D.Virgin Islands 1985). Absent a contrary provision in the indemnification agreement, no tender of defense per se is required where the agreement affixes a duty to defend upon the indemnitor, and where the indemnitor is alerted to the existence of the claim. *Gulf Oil Corp. v. Mobile Drilling Barge or Vessel,* 441 F.Supp. 1, 7–8 (E.D. La.1975).

The claim at issue arose out of an interpretation of the 1977 license agreement between Carey and the TBTA. Therefore it qualifies as a claim resulting from a pre-closing date (i.e. pre–1982) event or state of facts. Accordingly, pursuant to the above noted paragraphs of the Transfer Agreement and the cases cited, Greyhound was obliged to come forward and defend Carey against that claim after being notified of it. Instead, after receiving notice of the TBTA claim, Greyhound responded with a letter containing conclusory defenses, without supplying any supporting data. *See supra* Letter from Greyhound to Carey dated October 23, 1984. Greyhound's response fails to qualify, under any definition, as assumption of the defense, and there is nothing in the letter to suggest any interest by Greyhound in assuming a defense to the TBTA claim.

Subsequent to receiving this letter Carey reached the above noted settlement with the TBTA. The fact that Carey entered into the settlement before notifying Greyhound of it does not weaken Carey's position. This is due to Greyhound's initial and knowing breach of its obligation to step forward and actively defend against the TBTA claim. *See, Firestine v. Poverman,* 388 F.Supp. 948, 950 (D.Conn.1975) (If an insured is found liable for a claim after its insurer chose not to defend against it, and if the insurer is later found to have had a duty to defend, the insurer will be liable to reimburse the insured for the cost of the defense and to pay the damages for which its insured was found liable. This liability extends up to the policy limits, *whether or not* the insurer might have had a good defense to the claim that it had a duty to indemnify.) *See also Krevolin v. Dimmick,* 39 Conn.Sup. 44, 48, 467 A.2d 948, 951 (Conn.Super.1983) ("[T]his contractual duty to defend its insured must be exercised by the insurer irrespective of the insurer's ultimate liability to pay a judgment under its policy, so long as the allegations of the complaint fall within the coverage. [ (Citations omitted.) ].") [3] Accordingly, having received sufficient notice and a meaningful opportunity to defend, Carey need only establish its potential liability to the TBTA, in addition to the reasonableness of the settlement, in order to recover indemnity from Greyhound.

Citing *H.S. Equities, Inc. v. Hartford Accident & Indemnity Co.,* Greyhound contends that this court should apply an actual liability standard. 661 F.2d 264 (2nd Cir.1981). However *H.S. Equities* involved an indemnification bond which covered "[a]ny loss through any dishonest, fraudulent or criminal act of any of the Employees [of the indemnitee]...." *Id.* at 266. Accordingly, indemnification liability under the bond was only triggered upon a finding of misconduct by an employee. The Court then held that the indemnitee's good faith settlement of a third party claim, alleging employee misconduct, merely amounted to

---

3. Pursuant to ¶ 17 of the Stock Purchase Agreement between Greyhound and Schiavone, Con-

necticut state law is controlling. *See* Greyhound's Memorandum of Law at 18 n. 4.

presumptive not conclusive evidence of the claim in dispute. *Id.* at 269. That presumption could be overcome by the indemnitor. *Id.* The court concluded that the indemnitor succeeded in overcoming that presumption, therefore the indemnitee was obliged to establish the misconduct of its employee before it could recover under the bond. *Id.*

In the instant case on the other hand the indemnification agreement bound Greyhound to defend against and indemnify for any and all costs suffered by Schiavone and Carey, arising out of *any demands* and settlements involving claims of third parties, resulting from any pre-closing date event or state of facts. Accordingly in the instant proceeding, unlike *H.S. Equities,* the indemnity obligation was not contingent upon a determination of the validity of the third party claim. Instead Greyhound had a contractual obligation to defend against all demands for payments by third parties relating to pre-closing events, and to indemnify for all settlements entered into relating to those claims. Since the instant claim falls within these parameters the indemnification obligation was triggered and *H.S. Equities* is not controlling.

Greyhound's response that Carey breached its duty to act reasonably, and should therefore be denied the requested relief, is disingenuous. To support its argument Greyhound quotes *American Ex. Is. Lin., Inc. s/s Exp. Amb. v. United States,* 390 F.Supp. 63 (S.D.N.Y.1975). "An indemnitee has a duty to act reasonably under all the circumstances so as to protect the indemnitor against liability." *Id.* at 68. *American Export* however involved a "demand for payment as to which it [(the indemnitee)] *knew* defendant [(the indemnitor)] was entitled to claim exemption [(Emphasis added)]...." *Id.* at 69. In the instant case on the other hand Greyhound cannot establish that Carey "knew" that it was not liable to the TBTA for the sum claimed. Greyhound does not contend that it provided Carey with any documents, aside from the conclusory letters of October 23, 1984 and March 1, 1985, to defend Carey and support Greyhound's contention that the TBTA claim was meritless, though

contractually obligated to defend against that claim.

Moreover, in qualifying its holding, the court in *American Export* stated:

This is not to say that a party loses its right to be indemnified because hindsight may show possible errors of conduct or judgment in resisting the claims advanced against the indemnitee, especially in instances when the alleged indemnitor has been notified of the trial and invited to participate [(footnote omitted)].

*Id.* at 69.

In the instant case, while Greyhound was notified of the TBTA claim from the outset, it failed to provide Carey with any of the supporting documents it now accuses Carey of unreasonably failing to secure. This is in spite of the fact that Greyhound was provided the opportunity to defend against the TBTA claim. Therefore it was Greyhound who acted unreasonably from the outset, remaining aloof from its obligation to defend. Accordingly Greyhound should not be permitted to escape liability for the consequences of its inaction by attempting to foist responsibility upon Carey.

(b) The Notice Greyhound Received of the § 365 Assumption Hearing was, Standing Alone, Sufficient to Give Greyhound an Additional Meaningful Opportunity to Defend Against the TBTA Claim

Due to: (1) Carey's subsequent status as a debtor in bankruptcy and (2) the executory nature of the Settlement Agreement, that Agreement was brought before this court, pursuant to § 365 of the Code, in order to determine whether assuming it would be in the best interest of Carey's estate. Greyhound concedes having received notice of the assumption hearing, nonetheless it failed to raise any objection to Carey's assumption of that Agreement. (Greyhound's Local Rule 13(h) Statement at 14–15). This is in spite of the fact that Greyhound had the contractual obligation to defend and indemnify Carey, and had twice been put on notice that pursuant to the Stock Purchase Agreement, Carey sought payment from it for the sum in

dispute. (*See supra* Memorandum and Letters from Carey to Greyhound dated August 3, 1984, September 7, 1984 and February 5, 1985).

█ Accordingly, the notice Carey supplied Greyhound of the TBTA's initial demand for payment and the subsequent notice of the § 365 hearing were each independently "sufficient to give the indemnitor [ (Greyhound) ] a meaningful opportunity to defend." *See Atlantic Richfield Co.,* 784 F.2d at 113. Since it received notice of *both* events Greyhound is now precluded from legitimately contending that it was denied such opportunity. As the Second Circuit stated: "If the indemnitor declines ... to take over the defense, the indemnitee is required to prove only its potential liability to the plaintiff." *Id.* This is especially the case where, as here, an indemnification claim is based on a written indemnification contract. *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207 at 1216–17 (In addition to establishing the reasonableness of the settlement, "[A] defendant need only show potential (rather than actual) liability to recover indemnity where ... the defendant's claim is based on a written contract of insurance or indemnification.") citing ·*Terra Resources, Inc. v. Lake Charles Dredging & Towing, Inc.,* 695 F.2d 828, 832 (5th Cir.1983); *see also Tankrederiet Gefion A/S v. Hyman-Michaels Co.,* 406 F.2d 1039 (6th Cir.1969). Therefore in order to recover indemnification from Greyhound Carey need only establish: (a) *potential* not actu-

al liability to the TBTA and (b) the reasonableness of the settlement. *See Atlantic Richfield Co.,* 784 F.2d at 112.

█ Greyhound responds by raising a number of additional arguments. First, Greyhound alleges that it lacked standing at the § 365 hearing to oppose assumption of the Settlement Agreement. This allegation is incorrect in light of § 1109(b) of the Code.[4]

█ The "business judgment test" is to be applied in determining whether to authorize the debtor in possession to assume an executory contract. *Group of Institutional Investors v. Chicago, Mil., St. P. & Pac. R.R. Co.,* 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943); *In re Minges,* 602 F.2d 38, 42 (2d Cir.1979); *In re National Sugar Refining Co.,* 26 B.R. 765 (Bankr.S.D.N.Y. 1983). Greyhound argues that because its objection would have been based on protecting its own interests, rather than those of Carey's estate, any such objection would have been irrelevant in determining whether it was in the best interest of Carey's estate to assume the Settlement Agreement. This is rank speculation that ignores those areas where Carey and Greyhound's economic interests co-existed.

Greyhound was aware that Carey sought indemnification for only a portion of the TBTA claim and that the balance was to be paid by Carey. Accordingly had Greyhound raised valid objections to Carey's assumption of the Settlement Agreement,

---

**4.** 11 U.S.C. § 1109(b) of the Code states:

"A party in interest, *including* the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under the chapter [ (emphasis added) ]".
11 U.S.C. § 1109(b).
The use of the term "including" in § 1109(b) does not limit the definition of party in interest to those listed parties. *See* 11 U.S.C. § 102(3); *See also In re Johns-Manville Corp.,* 36 B.R. 743, 747–48 (Bankr.S.D.N.Y.1984), *appeal denied,* 39 B.R. 234 (S.D.N.Y.1984), *reh'd denied,* 39 B.R. 998 (S.D.N.Y.1984) *aff'd,* 52 B.R. 940 (S.D.N.Y. 1985) ("[T]he listing of examples of parties in interest in Code Section 1109 is not meant to exclude other types of interested parties from the purview of that section.")

The fact that Greyhound was a potential debtor of Carey, rather than a creditor, did not deprive Greyhound of party in interest status. Indeed in addressing this issue in one of the *Johns-Manville Corp.* appeals, Judge Haight held that a particular insurance company might ultimately be regarded as an insurer of Johns-Manville and in turn be a potential "debtor of the debtor." *In re Johns-Manville Corp.,* 31 B.R. 965, 971 (Bankr.S.D.N.Y.1983). This relationship combined with the broad language of § 1109(b) of the Code, and the fact that the insurer lacked an alternative means to redress its grievance, were all relied upon in determining that the insurer was in fact a party in interest. *Id.* at 971–72. Analagously Greyhound was a potential "debtor of the debtor" at the time of the § 365 hearing and similarly qualified as a party in interest with standing to object to Carey's assumption of the Settlement Agreement.

Carey's rejection of that Agreement would have inured to Carey's benefit as well as Greyhound's. Therefore Greyhound wrongly concludes that any objection to Carey's assumption of the Agreement would have gone unheeded.[5]

Greyhound maintains in the alternative that even if it was successful in objecting to Carey's assumption of the Settlement Agreement, the TBTA would still have been left with an unsecured claim against Carey. According to Greyhound, in turn this would have left it with an obligation to indemnify Carey for that claim. Therefore Greyhound alleges that notification of the § 365 assumption hearing did not provide it the "meaningful opportunity to defend [that] is the indispensable element to be proven by the party seeking indemnity." citing *Atlantic Richfield* 784 F.2d at 113. Accordingly, Greyhound concludes that this alleged deprivation mandates the application of an actual liability standard.

Had Greyhound sought rejection of the Settlement Agreement and prevailed, the TBTA would have had a prepetition claim for breach of contract against Carey's estate, and in turn Greyhound would have been exposed to liability for its pro-rata portion thereof. *See* 11 U.S.C. § 365(g); *In re Minges*, 602 F.2d at 41; *First Fiscal Fund Corp. v. Fishers Big Wheel*, 36 B.R. 299, 302 (Bankr.E.D.N.Y.1984). However to the extent that payments for such unsecured claims amounted to merely a portion of the face amount of the TBTA claim, the difference between that portion paid out and the face amount of the claim asserted would have inured to the benefit of Carey's estate, and in turn to Greyhound. In addition, Greyhound's failure to preserve its rights at the assumption hearing represented the second time it failed to take affirma-

tive action to establish that the TBTA claim lacked merit.

Accordingly, Greyhound having twice had the opportunity to defend against the TBTA claim as it was required to do under the indemnification agreement, and having twice failed to do so, was afforded the requisite notice in accordance with *Atlantic Richfield*, 784 F.2d at 113. Therefore, the proper standard to apply in determining Greyhound's indemnification obligations is potential liability.

### B. *Carey was Potentially Liable to the TBTA*

#### 1. The Elements Establishing Potential Liability

The elements necessary to establish potential liability were most recently outlined in *Fontenot v. Mesa Petroleum Co.*, 791 F.2d at 1217–18.

> The requirement that the indemnitee rigorously establish its potential liability to recover from the indemnitor may serve a valuable function when there is no contractual relationship between the parties, but the existence of a valid indemnity agreement should ease the indemnitee's burden. A court confronted with such an agreement should insure [1] that the claim was not frivolous, [2] that the settlement was reasonable, [3] that it was untainted by fraud or collusion, and [4] that the indemnitee settled under a reasonable apprehension of liability. But to require the indemnitee to go farther and establish with certainty its actual liability is to rewrite the parties' indemnity agreement [ (footnote omitted) ].

*Id.* at 1217–18.

■ As noted, unlike *Atlantic Richfield*, the instant proceeding involves a val-

**5.** As to the argument that even had Greyhound objected to assumption of the Settlement Agreement, it nonetheless may have been assumed because other sections of the Agreement did benefit the estate, this Court notes the following statement by Judge Weinfeld in *American Export*:

> [A] prediction that a different result would have been achieved had plaintiff taken the measures referred to above cannot be stated with absolute assurance. On the other hand,

> it cannot be stated with absolute assurance that they would not have changed the result. It is sufficient that plaintiff was under a duty to take reasonable steps to protect the defendant's interests ... and it failed to do so.

390 F.Supp. at 69–70.

In the instant proceeding Greyhound failed to take adequate steps to protect its own interests. Therefore Greyhound cannot successfully avail itself of this argument to ultimately avoid indemnification liability.

id, written indemnity agreement. The question as to whether or not the term "Adult Fares" as used in the 1977 license agreement included "commutation fares" was and is a legitimate issue, despite Greyhound's arguments to the contrary. This is highlighted by Greyhound's concession that the TBTA demand letter to Carey was signed by the same TBTA official who negotiated the 1977 license agreement. (Greyhound's Memorandum of Law at 14 n. 3). Accordingly this Court concludes that the TBTA claim was not frivolous.

Greyhound alleges that the Settlement Agreement resulted from bad faith and collusion and that this is a material question of fact precluding summary judgment. To support this argument Greyhound cites *City of New York v. Baird*, 176 N.Y. 269, 275–78, 68 N.E. 364 (1903). *Baird* held that where an indemnitee was to be *fully* indemnified for liability ensuing from a settlement with a third party, the indemnitee's good faith in entering into that settlement remained a question of fact, due to the indemnitor's objection to the settlement voiced prior to its being entered into. *Id.*

Greyhound implies that Carey "took care of itself" in the Settlement Agreement and therefore the Settlement should be subjected to greater scrutiny. Specifically Greyhound is alluding to the fact that the Settlement provides Carey with annual toll concessions estimated at $268,000. However the toll concessions were explicitly granted in exchange for Carey's withdrawal of an administrative complaint and a court action against, *inter alia*, the Urban Mass Transportation Administration.[6] According to the terms of the Settlement this concession was unrelated to the resolution of the TBTA claim. In addition, of the total $393,000 settlement, $90,000 of it was not covered by the indemnification agreement. Therefore Carey did suffer a direct substantial pecuniary loss from the Settlement.

---

6. The Settlement Agreement provides *inter alia:* The TBTA agrees, upon the withdrawal by Carey of the administrative complaint and the federal court action as provided in paragraph 1, to modify its current schedule of toll rates, set

Most important, as discussed above, Greyhound did not meet its contractual obligation to defend against the TBTA claim. This point distinguishes the instant proceeding from *Baird* where no reference is made to the indemnitor's failure to fulfill any of its contractual obligations. *See id.* Greyhound was twice afforded and twice failed to meet its contractual obligation to intervene to resolve the TBTA claim. If Greyhound had any questions regarding Carey's good faith in entering into the Settlement Agreement, it was afforded its last clear chance to raise them at the § 365 assumption hearing. (*See* discussion *supra.*) By initially eschewing its contractual duty to defend against the TBTA claim after being timely notified of it, and after subsequently failing to object to the Settlement at the § 365 hearing, Greyhound cannot now rely on this bad faith argument.

Furthermore, at the time it entered into the Settlement Agreement Carey had a reasonable apprehension of liability based on the fact that: (1) Carey did occupy the Terminal during the period covered by the TBTA claim; (2) "Adult Fares" could reasonably be interpreted as encompassing "Commutation Fares," as the 1977 license agreement did not explicitly exclude the latter; and (3) Greyhound does not contest that at the time the Settlement Agreement was reached, Carey did not have either of the two earlier license agreements with which to compare the 1977 agreement. Accordingly, except for establishing the reasonableness of the Settlement, all of the elements necessary to affix indemnification liability upon Greyhound have been satisfied. The reasonableness issue is discussed below.

2. The Settlement Agreement Was Reasonable

Greyhound first contends that much of the Settlement Agreement liability was not enforceable due to the alleged passage of the applicable statute of limitations.

---

forth at 21 N.Y.C.R.R. § 1071.1, to provide that the toll at the Queens Midtown Tunnel for three-axle franchise buses shall be $1.75. (Settlement Agreement at ¶ 5).

Under New York law the statute of limitations for contract actions is six years. N.Y.Civ.Prac.L. & R. 213 (McKinney 1972). However, the license agreement between Carey and the TBTA specifically states that fares received by Carey were to be held in trust until same are paid over and delivered to TBTA's designated agent. (1977 License Agreement at ¶ 9(d)).

"The period within which a trust beneficiary may sue to compel the trustee to perform his duties begins when there has been 'a repudiation by the fiduciary which is *clear* and made known to the beneficiaries ... viewed in the light of the circumstances of the particular case.'" *Valle v. Joint Plumbing Industry Bd.*, 623 F.2d 196, 202 n. 10 (2nd Cir.1980) citing *In re Estate of Barabash*, 31 N.Y.2d 76, 80, 334 N.Y.S.2d 890, 893, 286 N.E.2d 268, 270 (1972) ("[t]he statutory period ... does not begin to run until the administrator has *openly repudiated* his obligation to administer the estate.") *See also Kosty v. Lewis*, 319 F.2d 744, 750 (D.C.Cir.1963). Where there has been no such repudiation, the mere passage of time will not suffice to cause the statute to run in the fiduciary's favor. *In re Lewin's Estate*, 245 N.Y.S.2d 254, 258, 41 Misc.2d 72, 75 (N.Y.Sur.1963).

 Nowhere does Greyhound allege that Carey repudiated its trust relationship with the TBTA. Therefore the limitation period relating to the TBTA claim had not commenced. Accordingly Greyhound is incorrect in concluding that Carey was absolved of liability, relating to any portion of the TBTA claim, due to the expiration of the statute of limitations.

 "[T]he reasonableness of a settlement must be measured by the extent of the financial exposure ... [the indemnitee] would have faced had the settlement not been consummated." *Atlantic Overseas Corp. v. Feder*, 452 F.Supp. 347, 353 (S.D. N.Y.1978), *aff'd without opinion*, 594 F.2d 851 (2d Cir.1978), *cert. denied sub nom. L.H. Feder Corp. v. Atlantic Overseas Corp.*, 444 U.S. 829, 100 S.Ct. 55, 62 L.Ed.2d 37 (1979). Greyhound argues that the Settlement Agreement was per se unreasonable due to the fact that it allegedly exceeded the face amount of the TBTA claim. However, had the TBTA prevailed in pursuing its claim, Carey would have been liable for the face amount of the claim plus accumulated interest, not to mention associated litigation expenses. N.Y.Civ. Prac.L & R. 5001(a) (McKinney 1972). Greyhound does not challenge Carey's estimation of that interest at $150,000. Therefore, in real figures, the Settlement was closer to seventy percent of the claim's face value. In addition, rather than compelling a lump sum payment, the Settlement provided for twelve equal, monthly installments. Accordingly, had Carey not settled the TBTA claim, its potential financial exposure would have been much greater than the settlement sum. Based on the foregoing this court concludes that the Settlement was reasonable.[7]

## VI. *Carey's Summary Judgment Motion is Granted*

There is no genuine issue as to any material fact and in accordance with the above:

---

**7.** Even were the settlement figure to more closely approximate the TBTA claim, this factor alone would not dismiss it from the realm of reasonableness. *See, Taylor Woodrow PLC v. Blitman*, 603 F.Supp. 1152, 1156 (S.D.N.Y.1985) ("The Federal Rules of Civil Procedure do not preclude a defendant from offering a plaintiff *more* than could possibly be obtained through litigation in order to avoid the time and costs of litigation [ (emphasis added) ].")

Greyhound seeks to distinguish the instant proceeding by noting that in reaching its conclusion in *Taylor Woodrow PLC* the Court relied in part on the fact that "[d]efendant has not introduced any evidence indicating that the information [upon which the settlement was based] was erroneous or otherwise unreliable." *Id.* at 1155. In the instant proceeding on the other hand, Greyhound contends that it has introduced such countervailing evidence, thereby allegedly pointing to the unreasonableness of the settlement. In determining the reasonableness of the instant settlement this Court must only concern itself with the facts known to Carey as of the settlement date. This is due to Greyhound's initial breach of its contractual obligation to defend Carey with the information it now relies on in asserting the Settlement's unreasonableness. To permit such waffling on the part of Greyhound would yield an inequitable result. *See Havanich v. Safeco Ins. Co. of America*, 557 F.2d 948, 952 (2nd Cir.1977).

(1) Greyhound twice failed to meet its contractual obligation to defend Carey against the TBTA claim, though timely notified thereof, (2) Carey was potentially liable to the TBTA for the disputed claim and (3) its Settlement of that claim was reasonable. Therefore Carey's motion for summary judgment is granted and Greyhound's counter-motion is denied. Greyhound is hereby ordered to indemnify Carey for the $303,000 portion of the Settlement, representing that portion of the settlement sum allocable to the period during which Greyhound occupied the Terminal. The request for costs and attorneys' fees is denied.

It is SO ORDERED.