**CAREY TRANSPORTATION, INC., Plaintiff,**

v.

**The GREYHOUND CORPORATION, Defendant.**

No. 87 Civ. 3743.

United States District Court, S.D. New York.

Nov. 30, 1987.

Shea & Gould, New York City, for plaintiff.

Mailman & Gigante, New York City, for defendant.

## OPINION

GRIESA, District Judge.

This case comes before the court on appeal from a decision of the bankruptcy court dated April 15, 1987, 72 B.R. 767. That decision granted summary judgment to Carey Transportation, Inc. in an adversary proceeding against The Greyhound Corporation.

For reasons which will be described in detail, Greyhound had an obligation to indemnify Carey against certain kinds of liabilities. The Triborough Bridge and Tunnel Authority ("TBTA") made a claim against Carey for alleged unpaid rents on the East Side Airlines Terminal. Carey settled this claim and demanded indemnity from Greyhound, which Greyhound refused. This led to an adversary proceeding by Carey against Greyhound in Carey's bankruptcy, and the grant of summary judgment in Carey's favor.

The decision of the bankruptcy court is reversed, and the case is remanded for further proceedings in accordance with this opinion.

## FACTS

Carey, sometimes referred to as "Gray Line," is engaged in, among other things, the business of transporting passengers by bus to New York City's Kennedy and LaGuardia Airports.

From 1968 until 1982 Carey was owned by Greyhound, a major national bus line. On May 4, 1982 Greyhound entered into a stock purchase agreement with Schiavone Carrier Corporation under which Schiavone purchased Carey from Greyhound. In section 3.6 of that agreement Greyhound represented that, except to the extent reflected in its balance sheet as of December 31, 1981, Carey had no liabilities or obligations of any nature. In section 3.24 of the agreement, Greyhound further represented the absence of any undisclosed facts which would materially and adversely affect the financial condition of Carey.

These representations made by Greyhound tied into an indemnity clause in sec-

tion 10.1 of the agreement, which specified that Greyhound would indemnify Carey for losses resulting from the inaccuracy of any representation or warranty made by Greyhound in the agreement and for losses resulting from any event at all occurring prior to the closing date of the agreement. Quoted below are the relevant portions of section 10.1. "Seller" refers to Greyhound, "Buyer" and "the Companies" refer to Carey.

> Seller hereby indemnifies and agrees to hold harmless Buyer and the Companies against ... [a]ny and all damages, costs, expenses (including attorneys' fees), losses or deficiencies paid or suffered by Buyer or any of the Companies (including, without limitation, all damages, costs, expenses and losses arising out of any and all actions, suits, proceedings, demands, penalties, assessments, judgments and settlements involving claims of third parties against the Companies or Buyer), resulting from, involving or reflecting (i) the inaccuracy of any representation or warranty made by Seller under this Agreement ... or (iii) any event occurring, or state of facts coming into existence, before the Closing Date....

Section 10.4 provided that Greyhound would assume the defense, at its own cost, of any action, suit, proceeding or demand against which Greyhound had an obligation to indemnify Carey and for which there was no insurance.

> *10.4. Seller's Agreement to Defend.* Without in any way limiting the scope of Sections 10.1 ..., Seller hereby agrees that if an action, suit, proceeding or demand against which Seller is obligated to indemnify Buyer and the Companies pursuant to this Section 10 involves any uninsured claim, or any claim as to which any insurance company refuses to assure the defense, Seller will promptly assume the defense against such action, suit, proceeding or demand at its sole cost and expense, will indemnify and hold harmless Buyer and the Companies against the cost and expense of such defense and will promptly pay all penalties, assessments, judgments and settlements im-

posed or made in connection with the foregoing.

At the time Greyhound sold Carey to Schiavone in 1982, Carey had an agreement with the Triborough Bridge and Tunnel Authority under which Carey leased a property known as the East Side Airlines Terminal. This arrangement continued until March 31, 1984 at which time Carey vacated the property. There was a rental agreement between Carey and the TBTA which was dated January 18, 1977 and was retroactive to November 16, 1976. It continued to be in effect until Carey left the terminal in March 1984. The agreement provided that Carey would pay rent based on a formula determined by the number of passengers that Carey transported. This formula was contained in section 9(a) of the agreement, as follows:

> (i) $0.125 for each of the first million adult fares transported to/from airports covered by this agreement;
>
> (ii) $0.20 for each additional adult fare between one million and one million five hundred thousand;
>
> (iii) $0.35 for each additional adult fare over one million five hundred thousand.

One phase of the problem in this case involves Carey's alleged non-payment of rental based on "commutation fares." In this connection certain background facts need to be set forth.

Carey commenced occupying the East Side Terminal in 1952. The original 1952 lease between Carey and the TBTA had treated commutation fares differently from adult fares. It provided for rental based on "3¢ for each adult fare, ... and 1¢ for each commutation fare collected by the Tenant in the New York Ground Service and 2¢ for each adult fare ... and 2/3¢ for each commutation fare collected by the Tenant in the New Jersey Ground Service." That lease expired in 1973, and in 1974 the TBTA sent Carey a proposed lease, which again had reference to adult fares and commutation fares. This proposed lease was never signed. However, Carey continued for a time to pay rent based on a formula involving both adult fares and commutation

fares. A lease was finally signed on January 18, 1977, retroactive to November 16, 1976. This was the lease, referred to earlier, which was in effect until Carey vacated the East Side Terminal in March 1984. The 1977 lease based the rent solely on adult fares and contained no provision for calculations involving commutation fares. An affidavit of William Sanders, former executive vice-president of Carey, states that the parties specifically intended to exclude commutation fares from the rent formula. For the period commencing November 16, 1976, Carey paid no rental based on commutation fares.

On July 17, 1984, some two years after Greyhound's sale of Carey to Schiavone, the TBTA sent Carey a letter claiming $392,773 for underpayment of rent for the period November 16, 1976 through March 31, 1984. The letter stated:

A recent audit of your books and records has disclosed that during the period from November 16, 1976 through March 31, 1984, Carey failed to pay rent to the Authority for its operations at the East Side Terminal in the total amount of $392,773.00.

This underpayment is attributable to Carey's exclusions from the rent formula of commutation fares, round-trip fares, and fares collected at points other than the East Side Airlines Terminal. Our agreement dated January 18, 1977 ... does not authorize such an exclusion.

Payment of the above sum, together with interest, should be made promptly to the Authority.

As the above quotation indicates, the letter referred to three items: (1) commutation fares, (2) round-trip fares, and (3) fares collected at points other than the East Side Terminal. As described earlier, the record shows that after November 16, 1976 rental was not in fact paid based on commutation fares because Carey believed that such rental was not owing. However, there is no evidence before the court indicating that Carey had any reason to exclude from the rental base round-trip fares or fares collected at points other than the East Side Terminal. Also, although the TBTA letter alleges that Carey did not make rental payments based on these two types of fares, there has been no determination as to whether this allegation was correct.

Following receipt of the July 17, 1984 letter, Carey apparently carried on some informal discussion with Greyhound regarding the TBTA's claim. However, no evidence has been presented about what occurred in these discussions.

The first written notice of the TBTA claim, given by Carey to Greyhound, was a letter of September 7, 1984, which stated in pertinent part:

Pursuant to your request and in order to have a more meaningful discussion at our meeting on Tuesday, I am enclosing a copy of a memorandum prepared by Dan Correa of Carey/Gray Line. The memo discusses the items which we believe are chargeable to Gray Line. Please note the attachments A–E to the memo.

I am also enclosing a letter and two pages of an analysis sent to Carey/Gray Line by the Triboro Bridge and Tunnel Authority which provide additional backup for the third item discussed in Dan Correa's memo.

If you have any questions concerning this information, I would be happy to discuss it with you. Otherwise, I assume we will discuss it at the meeting on Tuesday.

Enclosed with Carey's letter were the July 17 letter from the TBTA to Carey, quoted earlier, two pages of a TBTA analysis of the rent due, and a memorandum by Carey's Controller, Dan Correa. The TBTA analysis indicated that the total back rent due to TBTA was $393,303. This is $530 more than the amount of payment asked for in the July 17 letter. This difference is not explained in the evidence.

The TBTA analysis purported to show a detailed breakdown of the alleged unpaid rent. The various figures were shown year by year for the period November 16, 1976 to November 15, 1983, and then for the partial year from November 16, 1983 to March 31, 1984. There were sets of figures making up the amounts of rent which

*should have* been paid. These were headed "Full Fares," "Commutation Tickets," and "Round Trips." The total figures for these respective categories were $1,907,-724, $121,736, and $8,883, giving a grand total of $2,038,343. The analysis stated that the amount *actually* paid by Carey was $1,645,040. The difference between the $2,038,343 and the $1,645,040 was the $393,303 allegedly unpaid and owing.

It should be noted that the TBTA's July 17, 1984 letter referred to three items involved in the alleged deficiency (commutation fares, round-trip fares, and fares collected at points other than the East Side Terminal). However, the breakdown in the TBTA analysis showed figures for "full fares," commutation fares and round trips, but no separate figures for fares involving points other than the Terminal.

As already stated, the total alleged shortfall was $393,303. The total of the commutation ticket and round trip items set forth in the TBTA analysis was $130,619. Thus the portion of the shortfall not involving commutation tickets and round trips was $262,684. Although one might infer that this $262,684 related to the third item mentioned in the July 17 letter,—*i.e.,* fares from points other than the terminal—the analysis does not say so, or give any separate breakdown for this category.

Also enclosed with Carey's letter to Greyhound of September 7 was a copy of a memorandum prepared by Daniel Correa, Carey's controller, and addressed to Judith Spanier, an attorney for Carey. The memorandum set forth calculations of the amount of the TBTA claim which Greyhound was allegedly liable for under the indemnification clauses of the Greyhound–Schiavone stock purchase agreement. Correa attributed 80% of the TBTA claim of $392,773 to Greyhound, based on Greyhound's ownership of Carey for six years (1977–1982) of the total seven and one half year period that the TBTA claim covered. This 80% amounted to $314,218, which was then reduced by $14,385 in accord with a provision of section 10.1 of the indemnity agreement that made Greyhound not responsible for the first $25,000 in losses.

Correa subtracted $14,835 instead of $25,-000 because there had already been $10,615 in losses unrelated to this case that Carey covered. The net balance due from Greyhound, according to Correa, was $299,833. The Correa memorandum stated that the portion of the TBTA claim relating to the period after the sale of Carey to Schiavone, for which Carey, not Greyhound, would be responsible, was $78,555. The sum of the amounts $299,833, $14,385 and $78,555 is $392,733, which is the amount claimed in the TBTA's July 17 letter. As indicated above, this is $530 less than the total amount indicated as due in the TBTA analysis.

It should also be noted that Correa neglected to take into account that, according to the TBTA analysis, the entire amount due for round trips was attributable to the years 1983 and 1984. The total of the amounts ascribed to round trips was $8,883. The effect of Correa's calculation was to mistakenly attribute 80% of this ($7,106) to Greyhound.

While the Carey letter of September 7 included the Correa memorandum indicating that a large part of the TBTA claim was chargeable to Greyhound, the letter did not request any action on the part of Greyhound. Specifically, it did not demand any payment, nor did it request that Carey assume the defense of the TBTA claim. Rather, the letter referred to a planned meeting between Carey and Greyhound to be held on "Tuesday" at which time the matter was to be discussed.

There is no evidence as to whether this meeting was ever held, and if so, what was discussed. Indeed, both parties to this litigation have stipulated that nothing relevant to the disposition of this action occurred between September 7 and October 23, at which time Greyhound sent a letter to Carey.

In the October 23, 1984 letter Greyhound took the position that Carey was not responsible for the commutation fares since the January 1977 rental agreement with the TBTA "specifically excluded any fees for commutation ... fares." The letter noted that the 1977 agreement was "nego-

tiated with TBTA by our management and counsel for TBTA and no doubt exists about the miscalculation of fees by TBTA." The letter further stated that "Carey was audited during the 1977 agreement and at no time did TBTA challenge agreement not to pay on commutation tickets." The letter did not address the TBTA's claims for rent based on round-trip fares and fares collected at points other than the East Side Terminal. Greyhound concluded the letter by making the "request and demand that neither Carey Transportation, Inc. nor Schiavone Carrier Corporation take any action or delay in protecting our interests by inaction with respect to this unfounded claim for pre–1982 fees."

There was no response by Carey to the Greyhound letter of October 23. There was no communication between Carey and Greyhound between October 23, 1984 and February 5, 1985. On the latter date, Carey notified Greyhound of a settlement it had entered into with the TBTA on January 17, 1985. At no time had Carey notified Greyhound that settlement discussions were being held. Carey made no effort to find out what information Greyhound had to support the position taken by Greyhound in its October 23 letter that the TBTA's claim was invalid, at least in part.

The settlement agreement between Carey and the TBTA provided that:

1) Carey would pay the TBTA a total of $393,303 over one year in equal monthly installments to settle the claim for back rent. This is 100% of the amount set forth in the TBTA analysis referred to earlier.

2) The TBTA forfeited interest due on the claim for back rent.

3) Carey agreed to withdraw two complaints against the Metropolitan Transit Authority (MTA), the parent of the TBTA. These complaints, one of which was an administrative complaint filed with the Urban Mass Transit Administration, and one of which was filed in United States District Court, were unrelated to the TBTA claim for back rent.

4) The TBTA granted Carey toll concessions worth in excess of $268,000 annually.

Carey, in its letter of February 5, 1985 informing Greyhound of the settlement, demanded that Greyhound indemnify Carey for Greyhound's share of the settlement of the TBTA rent claim. The amount demanded by Carey was $303,000. This was $3,167 more than the figure of $299,833 set forth in the correa memorandum. This discrepancy is not explained.

By letter dated March 1, 1985 Greyhound refused Carey's demand, noting that Carey had settled the TBTA's claim without any notice to Greyhound and for 100% of the TBTA's claim. In subsequent papers filed with the court, Greyhound has also argued that the toll concessions provided under the settlement must have been linked to the settlement of the TBTA claim. This allegation is denied by Carey. There are insufficient facts in the record to resolve this dispute.

On April 4, 1985 Carey filed for protection under Chapter 11 of the United States Bankruptcy Code. Carey then filed a motion under section 365 of the Code seeking permission to assume the TBTA settlement agreement. Although notice of a hearing on this motion was received by Greyhound, there was no appearance by Greyhound in connection with the motion. The bankruptcy court granted the motion.

Carey commenced an action in the bankruptcy court on August 9, 1985 against Greyhound claiming the right to be indemnified for Greyhound's alleged share of the settlement with the TBTA.

In the bankruptcy court, Carey moved for summary judgment. Greyhound opposed, and made a cross-motion for summary judgment.

The bankruptcy court, in an opinion dated April 15, 1987, granted Carey's motion for summary judgment and denied Greyhound's motion. *In re Carey Transportation, Inc.,* 72 B.R. 767 (Bankr.S.D.N.Y. 1987). The court noted that section 10.4 of the stock purchase agreement between Greyhound and Schiavone gave Greyhound the responsibility of assuming the defense against any "action, suit, proceeding or demand" against which Greyhound was obligated to indemnify Carey. The court relied

upon section 10.1(iii) of the agreement, which mandated indemnification for claims based on events occurring prior to the closing date of the stock purchase agreement. The court found that the TBTA claim arose from a pre-closing date event and that Greyhound was accordingly obligated to assume the defense once notified of the claim. Carey's letter of September 7 to Greyhound constituted such notice, according to the court, but Greyhound took no meaningful steps to defend. Additionally, the court made a point that Greyhound had notice of the hearing in the bankruptcy proceeding on Carey's motion to assume the settlement agreement. According to the court, this gave Greyhound a second "opportunity to defend" against the TBTA claim, but Greyhound for the second time failed to perform its duty. *Id.* at 774–76. Of course, Greyhound at no time took on the task of defending Carey against the TBTA claim.

The bankruptcy court examined the question of whether Carey was required to prove that it was actually liable to the TBTA in order to obtain indemnity for its settlement with the TBTA. Following *Atlantic Richfield Co. v. Interstate Oil Transport*, 784 F.2d 106, 110–11 (2d Cir. 1986), *cert. denied*, — U.S. —, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986), the court ruled that Carey did not need to prove actual liability. Rather, since Greyhound had received sufficient notice and a meaningful opportunity to assume the defense, Carey needed only to prove that it was potentially liable to the TBTA and that the settlement with the TBTA was reasonable.

Finally, the court found that there was in fact potential liability and that the settlement was reasonable. Summary judgment was granted in favor of Carey.

### DISCUSSION

As already described, the stock purchase agreement of May 4, 1982 contained the indemnity provisions upon which this action is founded. Paragraph 17 of the agreement provided that Connecticut law will apply. Although some Connecticut cases have been cited to this court, other cases have been referred to. There is no indication that, on the issues involved in this case, Connecticut law is any different from the law generally applied in other jurisdictions in this country.

Where an agreement provides for indemnity against liability under specified circumstances, the party seeking indemnity ordinarily must prove that he is in fact liable under the particular circumstances described in the agreement. If he settles without a judicial finding of liability, he must normally prove the existence of his liability in a suit against the indemnitor. *In the Toledo*, 122 F.2d 255, 257 (2d Cir.), *cert. denied*, 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. 551 (1941). However, there are exceptions to this general rule.

One such exception is where the indemnitor has a duty to defend. Such a duty applies to any claim of the type listed in the indemnification agreement, even if the claim is without merit. If the duty is breached, the indemnitor will be bound by a reasonable settlement of the claim. *Alderman v. Hanover Insurance Group*, 169 Conn. 603, 363 A.2d 1102, 1106 (Conn.Sup. Ct.1975), *Missionaries of Co. of Mary, Inc. v. Aetna Cas. & S. Co.*, 155 Conn. 104, 230 A.2d 21, 26 (Conn.Sup.Ct.1967). Where the indemnitor, regardless of any explicit duty to defend, is given notice of the claim and an opportunity to approve a proposed settlement or to take over the defense, and the indemnitor fails to do either, then the indemnitee can proceed and make a reasonable settlement of the claim. The indemnitee can then recover for the settlement on a showing that he was potentially liable. *Atlantic Richfield Co. v. Interstate Oil Transport*, 784 F.2d 106, 113 (2d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986). *See also Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1216–17 (5th Cir.1986), *Tankrederiet Gefion A/S v. Hyman–Michales Co.*, 406 F.2d 1039 (6th Cir.1969).

Where an indemnitor is subject to an express duty to defend, and where the indemnitee fails to give adequate notice of the claim or makes a settlement without giving the indemnitor reasonable opportu-

nity to participate, the indemnitee cannot recover indemnity for the settlement without proving actual liability. *See Atlantic Richfield,* 784 F.2d at 113.

Section 10.4 of the Greyhound–Schiavone stock purchase agreement expressly refers to indemnity for settlements. However, neither side presents any argument based on this reference or contends that it results in any departure from the normal legal rules.

Applying these rules to the facts of the present case leads to the conclusion that Carey was not entitled to summary judgment in the bankruptcy court. That court was in error in ruling that the September 7, 1984 letter from Carey and the subsequent events provided Greyhound with "sufficient notice and a meaningful opportunity to defend." *See In Re Carey Transportation, Inc.,* 72 B.R. at 733. The Carey letter did not make any request that Greyhound assume the defense against the TBTA demand. The indications in that letter were that the problem was entirely in the discussion stage, and as far as Carey and Greyhound were concerned, the matter was to be discussed at a meeting the following Tuesday. The evidence does not show what if any discussions were held on Tuesday or at any other time immediately following the September 7 letter.

The bankruptcy court does not mention the fact that a substantial part of the TBTA claim was not subject to indemnification by Greyhound. Under Carey's own calculations this amounted to about $93,000 (the $78,555 plus the $14,385 referred to earlier). Greyhound could not be expected, on the basis of the September 7 letter, to launch forth as the sole defender of the claim made by the TBTA. Further consultation with Carey would be necessary to determine how to jointly organize the defense of the TBTA claim, if such a defense were necessary.

When it came to the settlement negotiations carried on by Carey with the TBTA, Carey had a duty to give Greyhound a reasonable opportunity to participate. Carey did the opposite. It told Greyhound nothing, and gave Greyhound no opportunity whatever to take part in the settlement negotiations.

It should be noted that the bankruptcy court stated that on January 11, 1985 the TBTA commenced an action against Carey. The fact is that on that date a summons was filed in the state court. However, it was apparently never served on Carey. More importantly, Greyhound was never notified.

The bankruptcy court erred in holding that Greyhound neglected a second opportunity to defend the TBTA claim, when Greyhound declined to participate in the hearing in the bankruptcy proceeding on Carey's motion to assume the settlement agreement.

The obvious fact should be noted at the outset—*i.e.,* that the settlement agreement between Carey and the TBTA had already been concluded about two months prior to the assumption hearing. The issue in that hearing did not involve some kind of *de novo* reconsideration of the desirability of the settlement. The assumption hearing was under no circumstances the equivalent of allowing Greyhound to participate in the original settlement negotiations. The validity of the settlement agreement was not in question in the assumption hearing. The issue in that hearing was whether the settlement payments would be made as scheduled by the debtor in possession, or whether the TBTA claim would have a mere claim for breach of the settlement contract. 11 U.S.C. § 365; *In Re Minges,* 602 F.2d 38, 41 (2d Cir.1979). Thus, Greyhound could not have really "defended against" the TBTA claim in the assumption hearing. This was not a forum in which Greyhound had an opportunity to defeat the TBTA claim or invalidate the settlement agreement.

Indeed, Greyhound would have been most ill-advised to participate in the assumption hearing. Greyhound's position was that it was in no way a party to the settlement agreement and was not bound by that agreement, a position which was, to say the least, a reasonable one. Greyhound would have severely compromised that position by involving itself in the as-

sumption hearing. For these reasons, it cannot be said that Greyhound was committing any breach of duty by failing to participate in that proceeding.

■ To recapitulate, it is of course true that Greyhound received notice of the TBTA claim. However, the only evidence in the record as to the substance of this notice is Carey's September 7, 1984 letter, and in this letter Carey went no farther than to indicate that there were to be discussions between Carey and Greyhound. Subsequently, instead of requesting that Greyhound defend the claim, or indicating in any way that Greyhound should defend, Carey took the matter entirely and exclusively into its own hands and entered into a settlement with the TBTA without telling Greyhound what was transpiring. Under the rules of law summarized earlier, Carey cannot claim the right to an exception from the general rule that in order to be indemnified against a settlement, the indemnitee must prove that it is actually liable to the party with whom it has settled.

The bankruptcy court has, of course, not made any determination as to whether Carey was actually liable to the TBTA. It examined only the question of "potential liability" and the reasonableness of the settlement in view thereof. The matter must be remanded to the bankruptcy court for appropriate findings on the question of whether Carey is actually liable to the TBTA for any amount for which Greyhound is obligated to indemnify Carey.

In connection with the remand, it is appropriate to discuss one determination of the bankruptcy court, which, although made in connection with the ruling on potential liability, bears upon actual liability.

Greyhound raised the argument that approximately 40% of the TBTA's claim is time-barred under New York law, which provides that the statute of limitations for contract actions is six years. N.Y.Civ. Prac.Law § 213 (McKinney 1972 & Supp. 1987). According to Greyhound, that portion of the TBTA claim which related to events occurring more than six years prior to the January 17, 1985 settlement with Carey is barred.

■ This argument was rejected by the bankruptcy court for the following reasons. The 1977 rental agreement between the TBTA and Carey specified that rent due to the TBTA was to immediately vest in the TBTA as Carey collected its fares, and the amount owed as rent would be considered held in trust by Carey until paid to the TBTA. This condition was provided in section 9(d) of the rental agreement which stated that:

> Immediately upon Licensee's [Carey's] receipt of monies from operations under this agreement, the amount of said monies belonging to Authority, as above provided, shall immediately vest in and become property of Authority and are hereby deemed to be trust funds and are to be held by Licensee as trustees for the benefit of Authority until same are paid over and delivered to Agent, but such monies need not be segregated.

The six-year statute of limitations for contract claims applies to an express trust, but the limitation period does not begin to run until the trustee has repudiated the trust. *Valle v. Joint Plumbing Industry Bd.*, 623 F.2d 196, 202 n. 10 (2d Cir.1980). The bankruptcy court, following this rule, held that, since Carey had not repudiated the trust relationship with the TBTA, the TBTA claim was not time-barred.

On appeal, Greyhound argues that under section 9(c) of the rental agreement, rent was to be paid monthly, and that section 9(d) effectively created a series of monthly trusts, each of which ended when some amount of rent was paid to the TBTA. Greyhound contends that the statute of limitations began to run each month. This argument must be rejected in view of section 9(d) and the *Valle* decision.

## CONCLUSION

The decision of the bankruptcy court is reversed and the matter is remanded for proceedings in accordance with this opinion.

SO ORDERED.